MAUREEN J. TEBO & others[1] vs. BOARD OF APPEALS OF
SHREWSBURY & others[2]
(and two companion cases[3]).

Worcester.    May 5, 1986 — August 4, 1986.

Present: GRANT, KASS, & FINE, JJ.

*Zoning,* Special permit, Earth removal, Blasting, Board of appeals: decision.
*Open Meeting Law.  Notice.  Administrative Law,* Regulations.

Detailed conditions imposed by a town's zoning board of appeals in granting
a special permit to conduct earth removal operations were also adequate
as findings of fact, together with certain other findings, to support the
board's decision that, if the conditions were observed, earth removal
could be carried on without unreasonable adverse impact upon the sur-
roundings. [621-622]
The fact that in granting a special permit to conduct earth removal operations
a town's zoning board observed that it could exercise more supervision
over earth removal in conjunction with the grant of a special permit for
that purpose, than would be the case if a landowner removed earth as
matter of right incident to a construction project, was at most a collateral
consideration and did not amount to an untenable basis for the board's
decision. [622]
Where a local zoning board had given public notice, in accordance with the
requirements of G. L. c. 39, § 23B, of a meeting to consider the grant
of a special permit for earth removal operations, the board was not
required to give renewed notice to interested persons of adjourned ses-
sions, including the meeting at which the board deliberated and voted
to grant the special permit. [623]

---

[1] Paul F. Tebo, Peter DeMauro, Barbara N. DeMauro, John M. Crowton,
and Sprague Electric Company, all abutters to the locus as to which a
special permit was granted.

[2] Worcester Sand & Gravel Company, Incorporated, and Michael Trotto.
The latter owns the locus and the former operates a gravel pit. Trotto is a
principal officer of Worcester Sand & Gravel Company, Incorporated.

[3] The first of the two companion cases involves the same parties as are
involved in the lead case. The second companion case, No. 85-1220, is
Worcester Sand & Gravel Company, Incorporated vs. Board of Fire Preven-
tion Regulations.

A decision by a town's zoning board granting a special permit for earth re-
moval operations was in excess of the board's authority, where the
permit provided, "Before commencing any operation, a detailed plan of
dust control must be submitted to the Board for approval," where the
town's zoning by-law required the board to establish, as a condition for
the grant of such a permit, that "[s]atisfactory dust control provisions
have been agreed upon," and where the issue of dust control was a
determination of substance which could not be postponed for future
action. [623-625]

Certain comments made by the judge in an appeal from the grant of a special
permit did not indicate, as claimed by the plaintiffs, that the judge had
allocated the burden of proof to the wrong parties, but amounted to no
more than an expression that the judge was skeptical about the evidence
of one of the plaintiffs as to potential harm and that he was persuaded
by a defendant's evidence that it could operate in harmony with the
general intent and purposes of the zoning by-law. [626]

A regulation adopted by the Board of Fire Prevention Regulations which
restricted blasting activities in order to protect the manufacture of micro-
electronic components, even where safety considerations were not impli-
cated, was beyond the scope of the authority conferred on the board by
G. L. c. 22, § 14, and G. L. c. 148, § 9. [626-630].

CIVIL ACTIONS commenced in the Superior Court Department
on December 3, 1982, and March 25, 1983, respectively.

The cases were heard by *Andrew Gill Meyer,* J.

*Susan K. Scott* for Maureen J. Tebo & others.

*Roger J. Brunelle* for Worcester Sand & Gravel Company,
Incorporated, & another.

CIVIL ACTION commenced in the Superior Court Department
on October 12, 1984.

The case was heard by *Robert V. Mulkern,* J., on motions
for summary judgment.

*Roger J. Brunelle* for Worcester Sand & Gravel Company,
Incorporated, & another.

*Suzanne E. Durrell,* Assistant Attorney General (*Stanley
Adelman* with her) for Board of Fire Prevention Regulations.

KASS, J. All three cases[4] arise from the collision of the same
protagonists, Worcester Sand & Gravel Company, Incorporated

---

[4] One of the three, as will appear, requires little comment because the
issues raised are subsumed in one of the other cases.

(WS&G), which quarries rock and gravel, and Sprague Electric Company (Sprague), which makes microelectronic components. Blasting attendant to quarrying is inimical to the dust-free and vibration-free conditions required in the manufacture of products such as microintegrated circuits.

WS&G applied for a special permit to conduct earth removal operations on a sixty-seven acre area in Shrewsbury northeasterly of the Shrewsbury-Worcester line. Sprague manufactures microelectronic components in a Worcester facility 600 feet from the nearest point of WS&G's site[5] and Sprague, allied with other neighbors, sharply opposed the application. The board of appeals of Shrewsbury (hereafter the "zoning board") granted a special permit, an action that spawned what we shall refer to as "the zoning case." Against the possibility of disappointment in the zoning case, Sprague organized an effort to secure enactment of a protective State regulation. In due course, the Board of Fire Prevention Regulations (hereafter the "fire board"), which exists within the Department of Public Safety (G. L. c. 22, § 14), adopted a regulation which forbade blasting "within a two-and-one-half (2½) mile radius of a microelectronic manufacturing operation that will cause vibration velocities to exceed by more than ten percent (10%) the existing vibration velocity at said operation." 527 Code Mass. Regs. § 13.11(1)(e) (1984). A challenge to the validity of that regulation produced what we shall refer to as "the blasting regulation" case.

## I. *The Zoning Case.*

Shrewsbury's zoning by-law contains a provision, § VII(H), expressly dealing with earth removal. Except when earth removal is incidental to otherwise permitted construction activity, it requires a special permit from the zoning board, § VII(H)(1)(d). Subsection 2 of § VII(H) prescribes eleven conditions by which the board is to regulate earth removal.

---

[5] The Sprague plant is 1,800 feet from the precise area within the locus where gravel and rock removal was to begin.

Those include such matters as site plan approval, duration of the removal operations, limitation of removal to phases not exceeding ten acres at a time, buffer strips, the pitch of excavated slopes, final grading and restoration. By a decision filed with the town clerk on March 7, 1983, the zoning board, acting unanimously, granted a special permit for earth removal to WS&G. The zoning board found that WS&G had conducted a sand and gravel rock removal and rock crushing business in Shrewsbury for many years. As to the areas of concern raised by those in attendance at the public hearings, the zoning board said that it had given them close attention. Principal among those concerns were the dust and vibration which would be generated by blasting.

The zoning board then proceeded to lay down restrictive conditions for earth removal from the locus. Those included: (1) limitation of the area in which initial removal would take place; (2) limiting the slope at the perimeter of the excavation; (3) construction of a retention area for water runoff; (4) enclosure of the removal area with a six-foot high metal "non-climbable" fence; (5) limitation of access to the site to one entrance at which a gate was to be installed; (6) limitation of blasting to one blast per week and one detonation per day of blasting; (7) the taking of seismograph readings as specified locations in conjunction with each blast; (8) specification of time during which blasting and drilling may be conducted; (9) and establishing final grades and criteria for restoration following completion of quarry activity in a particular area.

(a) *Adequacy of findings.* By their nature, the detailed conditions imposed by the zoning board do double duty as findings that the special permit applied for might be exercised in harmony with the general purpose and intent of the zoning by-law, as the statute requires. See G. L. c. 40A, § 9.

If the conditions were faithfully observed, it followed that, in the view of the zoning board, earth removal could be carried on without unreasonable adverse impact upon the surroundings. The zoning board also found that WS&G had lawfully operated sand and gravel and rock crushing operations for many years in a location less than a quarter of a mile away. To attain a desir-

able industrial use (for which the locus was zoned) "substantial removal of rock and ledge would have to be done before any practical approach to construction could be undertaken." The board avoided the common vice of parroting the statutory standards for a grant of a special permit in lieu of findings. Compare *Josephs* v. *Board of Appeals of Brookline,* 362 Mass. 290, 298 (1972); *Warren* v. *Zoning Bd. of Appeals of Amherst,* 383 Mass. 1, 10 (1981); *Alpert* v. *Board of Appeals of Chelsea,* 6 Mass. App. Ct. 888, 889 (1978).

(b) *Asserted untenable ground.* As a reason for exercising its discretionary power in respect of special permits (see *MacGibbon* v. *Board of Appeals of Duxbury,* 356 Mass. 635, 637-639 [1970]; *Subaru of New England, Inc.* v. *Board of Appeals of Canton,* 8 Mass. App. Ct. 483, 486-488 [1979]) in a favorable manner, the zoning board reflected that under the zoning by-law it could exercise more supervision over earth removal in conjunction with the grant of a special permit for that purpose than would be the case if a landowner removed earth as matter of right incident to a construction project. At most this was a collateral consideration and not, as the appellants argue, an untenable basis for decision. See *Caruso* v. *Pastan,* 1 Mass. App. Ct. 28, 29-30 (1973); *Garvey* v. *Board of Appeals of Amherst,* 9 Mass. App. Ct. 856 (1980). Compare *MacGibbon* v. *Board of Appeals of Duxbury, supra* at 640-641. The primary basis for grant of the permit was that the quarrying could proceed in harmony with the by-law.

(c) *Open meeting law.* The proceedings before the zoning board stimulated two actions in the Superior Court. The first, sequentially, asked for declaratory relief and an injunction against the zoning board, prohibiting it from conducting a hearing on WS&G's second application (an earlier application had been withdrawn) for a special permit. That action was founded on a variety of claimed procedural irregularities, the most prominent of which was an asserted failure to comply with the open meeting law. See G.L. c. 39, §§ 23A and 23B. Following the grant of the special permit, the same parties filed a second action which employed the conventional procedure for review of zoning board decisions provided in G.L.

c. 40A, § 17. That complaint also alleged a violation of the open meeting law.

Concerning the asserted violations of the open meeting law, it is enough to record that the trial judge found that, fundamentally, G.L. c. 39, § 23B, had been complied with, that all parties had ample opportunity to be heard, and that, if any technical violations existed, they were de minimis. Accordingly, he concluded, no invalidation of action of the zoning board was warranted under § 23B. Power to set aside public action because of violations of § 23B is discretionary in nature. *Robinson* v. *Planning Bd. of Hingham,* 6 Mass. App. Ct. 835, 836 (1978). *Yaro* v. *Board of Appeals of Newburyport,* 10 Mass. App. Ct. 587, 592 (1980). There was no abuse of that discretion.

We are of opinion that public notice, made conformably with G.L. c. 39, § 23B, sufficed for adjourned sessions, including the zoning board's meeting of March 2, 1983, at which the zoning board deliberated and voted to grant a special permit to WS&G. Renewed notice by mail to interested persons was not legally required. See G.L. c. 40A, § 15. It frequently occurs that a case is not finished on the advertised hearing day. It would be awkward, indeed, if mailed notice were required of each successive session. In any event, the only session of which the appellants arguably did not have actual notice was the one at which the zoning board deliberated only. Cf. *Milton Commons Associates* v. *Board of Appeals of Milton,* 14 Mass. App. Ct. 111, 113-115 (1982).

(d) *Dust control.* Among the conditions which the Shrewsbury by-law requires the zoning board to establish, should it grant a special permit for earth removal, is that "Satisfactory dust control provisions have been agreed upon." See by-law § VII(H)(2)(e). None was. Rather, the special permit provided: "Before commencing any operation, a detailed plan of dust control must be submitted to the Board for approval."

Sprague and its fellow appellants mount a cogent attack that the special permit is defective because it postpones for future action a determination of substance, the fatal weakness of the special permit in *Weld* v. *Board of Appeals of Gloucester,* 345

Mass. 376, 378 (1963). The *Weld* case is often cited but almost invariably distinguished.[6] The core of the *Weld* rule, however, remains. It is that a permit granting authority in a zoning case (e.g., a board of appeals) may not delegate to another board, or reserve to itself for future decision, the determination of an issue of substance, i.e., one central to the matter before the permit granting authority. See *Board of Appeals of Hanover* v. *Housing Appeals Committee,* 363 Mass. 339, 374-375 (1973); *Potter* v. *Board of Appeals of Mansfield,* 1 Mass. App. Ct. 89, 95 (1973); and *Planning Bd. of Falmouth* v. *Board of Appeals of Falmouth,* 5 Mass. App. Ct. 324, 326-327 (1977). To illustrate: the availability of water supply was central in *Weld* to the use of the locus for a hotel; the design details of street lamps for a garden apartment complex would be, comparatively, peripheral. *Kiss* v. *Board of Appeals of Longmeadow,*

---

[6] See, e.g., *Shoppers' World, Inc.* v. *Beacon Terrace Realty, Inc.,* 353 Mass. 63, 69 (1967) (planning board to determine access); *Zartarian* v. *Minkin,* 357 Mass. 14, 18 (1970) (board reserved approval of additional off-street parking); *Y.D. Dugout, Inc.* v. *Board of Appeals of Canton,* 357 Mass. 25, 31 (1970) (comments on need for standards to guide board of appeal); *Board of Appeals of Hanover* v. *Housing Appeals Committee,* 363 Mass. 339, 374-375 (1973) (reference of approval of drainage and sewage systems to local and State boards of health and possible requirement of disclosure of leasing arrangements incorporated known and sufficiently definite standards); *Kiss* v. *Board of Appeals of Longmeadow,* 371 Mass. 147, 152, 158-159 (1976) (reference to planning board of building plans, the facility for off-street parking, the buffer areas, signs, and building location); *Caruso* v. *Pastan,* 1 Mass. App. Ct. 28, 31 (1973) (permit required sewer connection); *Potter* v. *Board of Appeals of Mansfield,* 1 Mass. App. Ct. 89, 95 (1973) (discusses standard); *Planning Bd. of Falmouth* v. *Board of Appeals of Falmouth,* 5 Mass. App. Ct. 324, 325-327 (1977) (permit required submission of new plans with specified modifications); *Shalbey* v. *Board of Appeal of Norwood,* 6 Mass. App. Ct. 521, 528 (1978) (permit required "adequate drainage"); *Ranney* v. *Board of Appeals of Nantucket,* 11 Mass. App. Ct. 112, 118 (1981) (reference of approval of shingles to Historic Districts Commission); *Balas* v. *Zoning Bd. of Appeals of Plymouth,* 13 Mass. App. Ct. 995, 996 (1982) (definite plans referred to planning board for determination that they comply with specifications established by board as conditions of special permit); *Falcone* v. *Planning Bd. of Stoughton,* 14 Mass. App. Ct. 950 (1982) (compares conditional approval by planning board); *Wolfman* v. *Board of Appeals of Brookline,* 15 Mass. App. Ct. 112, 120 (1983) (conditions of special permit and variances highly specific).

371 Mass. 147, 152, 158-159 (1976) represents, perhaps, the outer limit of deferral and delegation of decision. In that case the board of appeals referred to the planning board such substantial questions as approval of off-street parking and building location. Yet, in context, those questions constituted a working out of details peripheral from the central question of whether a tennis club should be allowed in a residence zoning district.

In the instant case the issue of dust control lies at the core of the controversy. Dust and vibration were the basis of opposition to the permit application. Sprague and another nearby manufacturer of microelectronic components, Micro-Networks, conduct certain operations in "Class 100" clean rooms in which a dust filtering system controls the admission of dust particulates. Too much ambient dust can overload the filtering system. Evidence concerning dust — where it would blow and when — was a major subject of testimony and exhibits before the zoning board and at the Superior Court trial. By providing in the special permits that, before the start of operations, "a detailed plan of dust control must be submitted to the [zoning board] for approval," the zoning board, in relation to a central issue, "invoked undefined standards and necessarily implied that the board would have to make a further determination to redefine the standard required." *Board of Appeals of Hanover* v. *Housing Appeals Committee,* 363 Mass. at 375. The special permit is defective.

Indeed, it seems to us that, under the text of the Shrewsbury by-law, a standard of dust control must be worked out before a special permit may issue. Section VII(H)(2) provides that the zoning board "may issue a special permit for the removal of earth subject to the following conditions," one of which is that "satisfactory dust control provisions have been agreed upon." The tense used implies that dust control problems and solutions are to be thought through before an earth removal permit issues, not afterwards.

The decision of the zoning board was in excess of its authority and it is necessary to remand the case to the zoning board for further proceedings consistent with this opinion. An order appears at the conclusion of this opinion.

A passing comment is appropriate about an issue urgently pressed by the appellants. They argue that the trial judge allocated the burden of proof to the wrong parties. This, the appellants say, is demonstrated by the judge's having commented in his findings that "[n]o evidence was submitted to show that the vibrations from blasting at the locus would definitely or even probably adversely affect Sprague's manufacturing process" and by his having ruled that "the evidence fails to demonstrate that vibrations from the once-a-week blasting will adversely affect Sprague's manufacturing process." WS&G, as the recipient of the permit, had the burden of going forward and proving that a permit could lawfully be granted to it. *Planning Bd. of Northborough* v. *Board of Appeals of Northborough,* 356 Mass. 732, 733 (1969). Compare *Selectmen of Ayer* v. *Planning Bd. of Ayer,* 3 Mass. App. Ct. 545, 548 (1975). It was not obliged to disprove every possible harm raised by its adversaries. The judge's comments were not indicative of a misunderstanding as to where the burden of proof fell; they were not more than an expression that he was skeptical about Sprague's evidence as to potential harm and that he was persuaded by WS&G's evidence that it could operate in harmony with the general intent and purposes of the zoning by-law.

## II. *The Blasting Regulation Case.*

The blasting regulation under attack, it will be recalled, forbids blasting within a two and one-half mile radius of a microelectronic manufacturing operation if it causes "vibration velocities to exceed by more than ten percent the existing vibration velocity at said operation." 527 Code Mass. Regs. § 13.11(1)(e) (1984). There are exceptions for blasting "entirely incidental to utility construction . . . roadwork, and in infrastructure construction." The full text of the regulation governing blasting near microelectronics plants appears in an appendix to this opinion.

We are not impressed with WS&G's arguments that the new blasting regulation is irrational, arbitrary, and capricious. Rather, we concentrate on whether there was statutory authority

to adopt the regulation. The agency which promulgated the regulation is the Board of Fire Prevention Regulations, and the statutory sources upon which it relies are G. L. c. 22, § 14, and G. L. c. 148, § 9.[7] The former statute provides that the fire board shall be within the Department of Public Safety, but not under the control of the Commissioner of Public Safety. Under G. L. c. 148, § 9, as amended through St. 1975, c. 764, the fire board is empowered to make rules and regulations for the "keeping, storage, use, manufacture, sale, handling, transportation or other disposition of gunpowder, dynamite, crude petroleum or any of its products, or explosive or inflammable fluids . . . or any substance having such properties that it may spontaneously, or acting under the influence of any contiguous substance, or of any chemical or physical agency, ignite, or inflame or generate inflammable or explosive vapors or gases to a dangerous extent . . . ." In sum, the fire board shall regulate explosives and, by simple extension, blasting. It has done so over the years. The question is whether the assignment of protecting the public and property generally against danger and injury from fire and explosion extends to protection of a particular class of economic enterprise.

When subjected to review of validity, an administrative agency's regulation has a running start. All rational presumptions favor validity, and administrative action will be declared void only if it cannot by any reasonable construction be interpreted in harmony with legislative mandate. *Consolidated Cigar Corp.* v. *Department of Pub. Health,* 372 Mass. 844, 855 (1977). Agency power need not be traceable to specific words. "An agency's powers are shaped by its organic statute taken as a whole." *Commonwealth* v. *Cerveny,* 373 Mass. 345, 354 (1977). *Levy* v. *Board of Registration & Discipline in Medicine,* 378 Mass. 519, 524 (1979). *Grocery Mfrs. of America, Inc.* v. *Department of Pub. Health,* 379 Mass. 70, 75

---

[7] The fire board, in its publication of the new regulation, identified G. L. c. 148, §§ 10 & 28, as additional sources of statutory authority. Section 10 prescribes procedures for adoption of amendments to the board's rules and regulations. Section 28 authorizes adoption of rules and regulations to prevent fire hazards.

(1979). *Purity Supreme, Inc.* v. *Attorney Gen.,* 380 Mass. 762, 776 (1980). Moreover, the agency's interpretation of its powers is entitled to respect. *Simon* v. *State Examiners of Electricians,* 18 Mass. App. Ct. 17, 21 (1984), *S.C.,* 395 Mass. 238 (1985).

Nonetheless, to be sustained, the regulation must be reasonably related to the purposes of the enabling legislation. *Levy* v. *Board of Registration & Discipline in Medicine,* 378 Mass. at 524. *Simon* v. *State Examiners of Electricians,* 395 Mass. at 249. *Greater Boston Real Estate Bd.* v. *Boston,* 397 Mass. 870, 876-879 (1986). See *Simon* v. *State Examiners of Electricians,* 18 Mass. App. Ct. at 34-35; *Nickerson* v. *Ribicoff,* 206 F. Supp. 232, 234 (D. Mass. 1962); Diver, Statutory Interpretation in the Administrative State, 133 U.Pa.L. Rev. 549, 597 (1985). An analysis of the statutory lineage of G. L. c. 148, § 9, discloses that the first legislative entry, St. 1871, c. 6, concerned the transportation of nitroglycerine and similar explosives. That act was repealed and more detailed provisions were enacted by St. 1877, c. 216, which, among other things, conferred (in § 2) upon cities and towns authority to adopt ordinances and by-laws "necessary for the protection of life and property" from explosives. Accidental explosion in populous surroundings, e.g., a railroad train carrying passengers, was a major concern of the statute. Further enactments give evidence of a legislative purpose to control explosives by reason of their capacity to maim and destroy. That appears from the officers (fire marshals [St. 1904, c. 370, §§ 1 & 2] and the fire inspection department of the district police [St. 1905, c. 280, § 1]), and subjects (pistols [St. 1910, c. 565] and fireworks [St. 1921, c. 485[8]]) with which the Legislature dealt.

By St. 1930, c. 399, § 1, the Legislature incorporated the provisions relating to explosives in what the act's caption described as a "uniform system of fire prevention throughout the

---

[8] The peril was thought to be acute. The act carried an emergency preamble to make it effective before holiday festivities on June 17, 1921, and July 4, 1921.

Commonwealth." The structure and subject matter of G. L. c. 148 as it appears in the books today is substantially that set out by the 1930 legislation. Study of the organic statute as a whole is persuasive that its preoccupation is safety; the Department of Public Safety has the over-all responsibility for that subject matter. Fire prevention, explosion prevention, and blasting regulation have the common objective of controlling phenomena which have an inherent potential for disaster. Before they are allowed to conduct blasting operations, persons must be examined and certified as competent by the Department of Public Safety. G. L. c. 148, § 20B. The occupations from which, under G. L. c. 22, § 14, as appearing in St. 1980, c. 462, § 1, members of the fire board are to be drawn are related to the prevention or management of calamity, e.g., heads of fire departments, a member of the Massachusetts Fire Prevention Association, a fire protection engineer, a chemical engineer, and "a representative of a national, regional or state association of the blasting industry who shall have been actively engaged for a period of not less than ten years in the keeping, storage, use, handling or transportation of explosives."

The fire board's writ to promulgate safety regulations of general applicability is surely very broad. Our difficulty with the regulation in question is that it does something quite different from protecting against hazard in the conventional sense. It proscribes blasting in certain locations irrespective of safety concerns. The blasting may threaten no lives, cause no rocks to fly, and impair no buildings. It is enough that it is within a certain distance of an occupation that wants a high degree of protection from vibration and dust. In a most attenuated way, we suppose the insulation of calibration equipment from vibration is a form of protection of property. The property concerned, however, is discrete and peculiarly vulnerable. The protection afforded by the regulation is not of general, but specially directed, applicability. Seen realistically, what the fire board's new regulation does is to favor one form of economic activity, manufacture of microelectronic components, over another form of economic activity, quarrying rock and grading land for development. It is quite apparent that economic choice,

rather than safety, underlies the regulation. The regulation tolerates existing vibration velocity; it tolerates blasting with vibration velocities in excess of specified limits if incidental to utility construction in public ways, roadwork, or infrastructure construction, and, significantly, it tolerates existing quarries even though they increase vibration velocity. Were any of those activities unsafe, we would expect the fire board would forbid them.

It is not a question of the rationality of the choice. We are aware that high technology is of long term economic importance to Massachusetts. There is more future in microchips than rock chips. The Legislature could rationally decide that the public interest requires a limitation on blasting activity, even though safety considerations are not implicated. The Legislature could delegate to an administrative agency, the fire board or some other agency, the formulation of rules and regulations which will govern the making of such an economic choice.

We are of opinion that the Legislature up until now has not conferred such authority on the fire board. Indeed, § 20C of c. 148 looks the other way. It limits strict liability from blasting activity to cases where the damage is direct, i.e., when rock falls on adjoining property and causes damage. See *Clark-Aiken Co.* v. *Cromwell-Wright Co.*, 367 Mass. 70, 83 n.14 (1975); *O'Connor* v. *E. J. DiCarlo & Sons*, 376 Mass. 927, 928 (1978). To recover for damage from concussion, it is necessary to prove the blasting was negligently, i.e., unsafely conducted. Thus, safe blasting is approved. For these reasons, we think the blasting regulation at issue is beyond the scope of the organic statute as a whole. See *Cardin* v. *Royal Ins. Co. of America*, 394 Mass. 450, 456-457 (1985); *Simon* v. *State Examiners of Electricians*, 395 Mass. at 249; *Greater Boston Real Estate Bd.* v. *Boston*, 397 Mass. at 878. See Jaffee, Judicial Control of Administrative Action 572 (1965).

As to the declaratory judgment action, which bears Worcester docket number 82-24337, the judgment is affirmed. As to the action brought under G. L. c. 40A, § 17, which bears Worcester docket number 83-25234, the judgment is reversed and a new judgment is to be entered: (1) that the decision of

the zoning board was in excess of its authority and is annulled, (2) that the case is remanded to the zoning board for further proceedings consistent with this opinion, and, (3) that the Superior Court shall retain jurisdiction of the case.

As to the blasting regulation case, the judgment is reversed and a new judgment is to be entered declaring that 527 Code Mass. Regs. § 13.11(1)(e) is beyond the scope of the statutory authority of the Board of Fire Prevention Regulations and, accordingly, invalid.

*So ordered.*

APPENDIX.

"(e) <u>Blasting Within a 2½ Mile Radius of a Microelectronic Manufacturing Operation.</u> Except as hereinafter provided, no blasting shall be conducted within a two-and-one-half (2½) mile radius of a microelectronic manufacturing operation that will cause vibration velocities to exceed by more than ten percent (10%) the existing vibration velocity at said operation.

"Alternatively, blasting may be conducted in accordance with the following table:

| Radial Distance in Miles from a Microelectronic Manufacturing Operation | Maximum Charge-Weight Per Delay in Pounds |
|---|---|
| Less than .75 | 0* |
| Between .75 and 1 | 110 |
| Between 1 and 1.5 | 200 |
| Between 1.5 and 2 | 450 |
| Between 2 and 2.5 | 800 |

"Blasting may be conducted that causes vibration velocities to exceed the limits set forth above when entirely incidental to utility construction in public ways and private property, in roadwork, and in infrastructure con-

---

* No blasting permitted that increases vibration velocity at the site of a microelectronic facility by more than 10%.

struction. With the approval of the Marshal, blasting may also be conducted that causes vibration velocities to exceed the above limits when entirely incidental to or in connection with the construction of any structure for which a building permit has been issued or for subdivisions which have been approved under M.G.L. c. 41. For all such blasting permitted by this paragraph, reasonable notice, but in no event less than seventy-two (72) hours prior to the proposed blasting, shall be given in writing to the management of the microelectronics operation, except that lesser notice may be given in certain emergency situations under M.G.L. c. 82, s. 40, the so-called 'Dig. Safe Law.'

"As used herein, 'microelectronic manufacturing operation' shall mean a facility that fabricates integrated circuits; and 'existing vibration velocity at a microelectronic manufacturing operation' shall mean the vibration velocity near the base of the facility which shall be measured by placing the vibration sensors near as possible to the base of the microelectronic facility at a location nearest the blasting site. The existing vibration velocity shall be established by measuring vibration during a typical one-minute period in the absence of blasting.

"Notwithstanding anything to the contrary in 527 CMR 13.11(1)(e), active quarries which have conducted blasting on a regular basis predating the effective date of 527 CMR 13.11(1)(e) shall be exempt from all the requirements contained herein, as well as roadwork quarrying operations and temporary quarries, a temporary quarry being an operation that has been granted a three-month permit which may not be renewed without approved site development plans from a planning board."