380 Mass. 471                                         471

White Dove, Inc. v. Director of the Division of Marine Fisheries.

WHITE DOVE, INC. *vs.* DIRECTOR OF THE DIVISION OF MARINE
FISHERIES [1] & another.[2]

Suffolk.  February 7, 1980. — April 23, 1980.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & LIACOS, JJ.

*Fisheries. Regulation. Administrative Law,* Regulation. *Words,* "Manner."

A regulation adopted in 1976 by the Director of the Division of Marine
   Fisheries providing that "No vessel shall take or attempt to take bluefin
   tuna with a purse seine without a Special Permit for a Regulated
   Fishery issued by the Director," and that special permits "shall be
   limited to those vessels having operated in the purse seine fishery for
   bluefin tuna in Massachusetts prior to 1974, as ascertained by official
   vessel logs or other accredited records," was authorized and validated
   by the substantive empowering provisions of G. L. c. 130, §§ 2, 17A,
   80, and 104 [474-477]; absence of a statutory provision in terms au-
   thorizing a regulation "limiting entry" to the purse seining fishery for
   the tuna was not significant [478-479].

QUESTION OF LAW certified to the Supreme Judicial Court
by the United States District Court for the District of Massa-
chusetts.

*Gene K. Landy* for the plaintiff.

*Carl Valvo,* Assistant Attorney General, for the defend-
ants.

KAPLAN, J.  In December, 1978, the plaintiff White
Dove, Inc., a New Jersey corporation engaged in commer-
cial fishing, commenced an action in the United States Dis-
trict Court for the District of Massachusetts attacking on
various Federal and "pendent" State grounds the validity of

[1] See G. L. c. 21, § 5, describing the Division as part of the Department
of Fisheries, Wildlife and Recreational Vehicles (headed by a Commis-
sioner) which is under the Executive Office of Environmental Affairs.

[2] Kenneth A. Crossman, Director of the Division of Law Enforcement
in the Executive Office of Environmental Affairs. See G. L. c. 21, § 6.

322 Code Mass. Regs. § 6.04, a 1976 regulation of the Massachusetts Division of Marine Fisheries governing the taking of Atlantic bluefin tuna. Under the regulation, the plaintiff's vessel *White Dove* could not obtain a "special permit," which would entitle it to take bluefin tuna by purse seine, for the reason that it had not operated in that purse seine fishery in Massachusetts prior to 1974. One of the claims advanced by the plaintiff in United States District Court was that the regulation was not authorized by statute. The District Judge denied the plaintiff preliminary injunctive relief against the regulation, and at the same time, on the defendants' motion, certified to this court under S.J.C. Rule 3:21 the question: "Did the Director of the Division of Marine Fisheries have statutory authority under G. L. c. 130, §§ 2, 17A, 80, and 104 to promulgate the 1976 tuna purse-seine regulation?" We shall answer the question, "Yes."

Accompanying the certified question is a statement of facts (see S.J.C. Rule 3:21, § 3[2], 359 Mass. 790 [1971]) which we condense, avoiding some detail, as follows. It is the giant bluefin tuna (300 pounds and over) that is of interest here. From December to June these fish are not found in Massachusetts waters, as part of the population moves to the Gulf of Mexico and another into mid-Atlantic waters. The fish are first sighted off the Massachusetts coast in early June and remain in the locality — both within and outside Massachusetts waters — well into the autumn. Cape Cod Bay is an important fishing ground, and it may be — so the plaintiff has contended — that in many, but not all years, the fish appear in "seinable configurations" only within that Bay.

The fish are taken mostly by purse seine or handgear. By the former method, an airplane spots a school and the mother vessel pays out a net around it, closes (purses) the net, and brings the net and contents onto the deck. Handgear fishing is done by individual handline (or rod and reel or harpoon) from relatively small boats.

In recent years the giant bluefin tuna have been destined predominantly for the Japanese market. They are not

380 Mass. 471                                     473

White Dove, Inc. *v.* Director of the Division of Marine Fisheries.

much fancied in this country, being darker, oilier, and with higher concentrations of mercury than the school-size (smaller) tuna.

In 1974, the Director adopted a regulation of the purse seine and handgear fisheries for the tuna. Purse seine fishing was allowed only in September and October but not beyond a total seine quota of 225 short tons; it was limited to vessels "having operated in the purse seine fishery for bluefin tuna in Massachusetts since 1964." Handgear fishermen each had a catch limit of two a day (or, at the option of any individual or company that had taken the fish in 1973, a seasonal limit equal to 80% of his or its 1973 catch).

A Federal Atlantic Tunas Convention Act, 16 U.S.C. § 971, et seq., was passed in 1975. Regulations thereunder (50 CFR §§ 285.29, 285.30, set forth at 44 Fed. Reg. 36050 [1979]) establish a total quota for all purse seine vessels of 300 tons of the fish; when that weight is reached, this kind of fishing for the giant tuna is closed until the following August 15. Each vessel using hand gear is permitted to take no more than one giant fish a day with a yearly limit for all vessels of 1,128 tons (northern area), or five fish a week with a limit of ninety tons (southern area). There are provisions for giving notice of fish taken.

In view of the Federal regulations, the Director after due procedures adopted the 1976 regulation (reproduced in the margin)[3] repealing the 1974 catch limits. The material pro-

---

[3] "*6.04: Taking of Atlantic Bluefin Tuna Thunnus Thynnus*

"Rules and regulations governing the taking of Atlantic Bluefin Tuna, *Thunnus thynnus,* by Net adopted under provisions of the General Laws of the Commonwealth of Massachusetts, Chapters 30A and 130, Sections 2, 17A, 80 and 104.

"(1) The use of nets for taking bluefin tuna other than purse seine or trap as prescribed in the following is prohibited: (a) Bluefin tuna may be taken in approved fish traps. However, the Director shall have the right to inspect any fish trap and modify its operation if he deems the trap is being set specifically to take bluefin tuna. (b) No vessel shall take or attempt to take bluefin tuna with a purse seine without a Special Permit for a Regulated Fishery issued by the Director of Marine Fisheries. Special Permits for a Regulated Fishery to take bluefin tuna with a purse seine shall be limited to those vessels having operated in the purse seine fishery

visions prohibited seine fishing before September 1, stated that no vessel should take bluefin tuna by purse seine without a "special permit for a regulated fishery" to be issued by the Director, and limited these permits to "those vessels having operated in the purse seine fishery for bluefin tuna in Massachusetts prior to 1974, as ascertained by official vessel logs or other accredited records."

As noted, the plaintiff's vessel *White Dove* could not qualify for a special permit under the 1976 regulation because it had not participated in the purse seine fishery before 1974; it was not equipped for tuna seining until 1976 and did not attempt such seining (which it could do outside Massachusetts coastal waters notwithstanding the regulation) until 1977. Similarly disqualified were two other prospective applicants for special permits. Only two vessels have obtained such permits, *A. A. Ferrante* and *Sea Rover*. The owners of these vessels operate them as a single company, selling the catch to a Japanese company. When the regulation was promulgated in 1976 the Division knew that these two vessels had participated in the seine fishery for the tuna prior to 1974 and knew of no other vessel currently in the fishery which had so participated.

1. The 1976 regulation, in the form of a "proposal," had to be given a public hearing and receive approval by the Marine Fisheries Advisory Commission (established by G. L. c. 21, § 5A), and, in the form of a regulation, required approval of the Commissioner of Fisheries, Wildlife and Recreational Vehicles, all before issuance by the Director. (See G. L. c. 130, § 17A, first par., and State Administrative Procedure Act, G. L. c. 30A, § 2.) The regulation is

for bluefin tuna in Massachusetts prior to 1974, as ascertained by official vessel logs or other accredited records.

"(2) Taking or attempting to take bluefin tuna with a purse seine prior to September 1, is prohibited.

"(3) Violation of these rules and regulations will result in immediate revocation of the Special Permit for a Regulated Fishery and shall be subject to a fine of not less than ten dollars nor more than one thousand dollars."

now to be measured against the substantive empowering provisions, notably those of G. L. c. 130, § 17A and § 80. The former speaks of proposals "relating to the management of the marine fisheries," eventuating in "rules and regulations . . . which shall govern the following activities only: (1) The manner of taking fish" (and other listed matters).[4] And § 80 states in part: "No person shall take or sell fish from a fishery regulated by the director without a regulated marine fishery permit, in addition to any other permit that may be required by this chapter.[5]

The plaintiff points out that there is no statutory provision which in terms authorizes a regulation "limiting entry," whence the plaintiff apparently reasons that all comers (presumably the holders of the ordinary commercial fisherman permits, see n.5) must be allowed to enter the purse seining fishery for the tuna, whose lawful catch has been severely controlled by the Federal authorities in the interests of conservation. But "the management of the

---

[4] General Laws c. 130, § 17A, provides: "Upon petition signed by any interested party or upon his own motion, the director shall submit to the marine fisheries advisory commission proposals relating to the management of the marine fisheries. After public hearing, notice of which shall be published in a newspaper of general distribution in the areas affected, the commission shall in writing approve or disapprove such proposals. If any proposal is so approved, the director shall in accordance with such approval adopt, amend or repeal rules and regulations, subject to the approval of the commissioner, which shall govern the following activities only: (1) The manner of taking fish; (2) The legal size limits of fish to be taken; (3) The seasons and hours during which fish may be taken; (4) The numbers or quantities of fish which may be taken; (5) The opening and closing of areas within the coastal waters to the taking of any and all types of fish; provided that no area shall be so opened or closed without the consent of the selectmen of the town or the mayor and council of the city affected thereby. Upon the request of the commission, the selectmen or mayor and council shall hold a public hearing upon the question and shall thereafter notify the commission in writing within forty-five days after such request has been received or consent will be deemed to have been granted.

"No such rule or regulation shall require a license for the taking of finned fish from coastal waters for non-commercial purposes."

[5] The "other permit" here involved is the ordinary "commercial fisherman permit." See § 80.

marine fisheries" in respect to "[t]he manner of taking fish" is a power of considerable dimension. "Manner" is surely not to be read as dealing just with the details of the physical process of reducing fish to possession; it takes in also some regulation of the industrial setup for the taking of fish. And in that connection there is nothing to forbid the Director from applying the device of limiting entry even though that is not made the subject of a separate conferral of power in the statute. Thus, as the Director suggests, the § 17A (1) power, playing in with the existing tight Federal limitation of the seine fishery catch, could be exerted appropriately to prevent "overcatching." [6] So also the power could be used to prevent "gear" conflicts between the seine and handgear fisheries.[7] Approaching the matter from another angle, we would expect common agreement that it would be a regulation of "manner" to prohibit altogether purse seining for the giant fish (as has been done in the case of salmon, 322 Code Mass. Regs. § 3.06), and to allow only the handgear method. The 1976 regulation, following progressively the 1974 regulation, may be seen as a step to the end of eliminating the seining of the giant fish in waters within our jurisdiction, for the vessels now allowed special permits will drop out of service or be otherwise eliminated or diverted in the course of time. In promoting any of the purposes mentioned, the Director and his advisors could properly decide to give consideration to the reliance interests of those already in the business of seine fishing for the tuna; hence the use of the device of barring entry to newcomers — a point on which the recent case of *New Orleans* v. *Dukes*, 427 U.S. 297 (1976), is suggestive.[8]

---

[6] It is indicated that three vessels purse seining the giant tuna in a single day have accounted for nearly half the 300 ton quota. The potential for overcatching is thus considerable.

[7] Conflict between purse seiners and those taking with less enveloping equipment may be called traditional. See *Corsa* v. *Tawes*, 149 F. Supp. 771, 776 (D. Md.) (three-judge court), aff'd, 355 U.S. 37 (1957) (per curiam).

[8] Here the Court upheld an ordinance of the city of New Orleans outlawing from the "French Quarter" all pushcart vendors who had been in

In light of the foregoing, the validity of the 1976 regulation can be upheld with minimal dependence on various supportive canons of interpretation well settled in this jurisdiction, in particular: That no more need be discerned than some rational relation between the regulation and the empowering statute. See *Consolidated Cigar Corp.* v. *Department of Pub. Health*, 372 Mass. 844, 855 (1977); *Mourning* v. *Family Publications Serv., Inc.*, 411 U.S. 356, 369 (1973). That respect is owing to an agency's own view that its regulation is within the statute. See *Casa Loma, Inc.* v. *Alcoholic Beverages Control Comm'n*, 377 Mass. 231, 235 (1979); *Board of Educ.* v. *Assessors of Worcester*, 368 Mass. 511, 515-516 (1975). That, indeed, there is a presumption that the regulation does not exceed the statute which is as strong as the presumption that a statute squares with the Constitution. See *Levy* v. *Board of Registration & Discipline in Medicine*, 378 Mass. 519, 525 (1979); *Colella* v. *State Racing Comm'n*, 360 Mass. 152, 159 (1971).

2. We deal with miscellaneous contentions of the plaintiff which fail, in our view, to overcome the interpretive result indicated. (a) The plaintiff makes a last minute discovery that in 1975 the Department of Natural Resources (which then embraced the Division of Marine Fisheries) sponsored a bill (1975 House Doc. No. 238) to amend § 17A to grant the Director the power to adopt regulations to govern a sixth "activity" — "[t]he amount of fishing effort." The Legislature did not adopt the proposal, but it is possible to trace the bill into an enactment which limits to 1,300 the number of commercial lobster permits the Director may issue annually. G. L. c. 130, § 38B, inserted by St. 1975, c. 484, § 1. The argument is that the Division and the Leg-

business less than eight years. The legislative objective was to preserve the area's charm by eliminating all these peddlers but, "rather than proceeding by the immediate and absolute abolition of all pushcart vendors, the city could [as against a claim of arbitrariness] rationally choose initially to eliminate vendors of more recent vintage. This gradual approach to the problem is not constitutionally impermissible. . . . The city could reasonably decide that newer businesses were less likely to have built up substantial reliance interests in continued operation . . . ." *Id.* at 305.

islature understood in 1975 that there was a lack of power to issue a regulation on the style of the 1976 regulation and that the bill was designed to supply the power. But it may be that the bill looked simply to a power to limit the number of permits, which the 1976 regulation did not purport to do. In all events, the intimation of a consciousness of lack of power must face the fact that the Division had issued in 1974 a regulation resembling the 1976 regulation. The question, moreover, is what was intended by the original enactment of § 17A, and inaction by a subsequent Legislature carries little weight in defining that intent. See *Massachusetts Comm'n Against Discrimination* v. *Liberty Mut. Ins. Co.*, 371 Mass. 186, 193-194 (1976). If inaction is given much weight, an agency would be reluctant to seek merely clarifying amendments for fear of the inference that would be drawn from their failure to pass. *Id.* at 194.

(b) Counsel remind us of the common law tradition that the right to fish is "public and common to every person," *Weston* v. *Sampson*, 8 Cush. 347, 352 (1851), and we are warned against a casual derogation from the common law. It may be enough to say that the current reality is not a common law regime penetrated here and there by statute, but a well statutized law of marine fisheries.

(c) The plaintiff reaches back to *Gibbons* v. *Ogden*, 22 U.S. (9 Wheat.) 1 (1824), for the argument that the licensing of *White Dove* to engage "in the coasting trade and the taking of fish of every description" under the Federal Enrollment and Licensing Act of 1793, 46 U.S.C. § 263 (1976), forbids the Commonwealth to bar the plaintiff's vessel from the seine fishing while admitting others vessels to it. We recognize that on this question of preemption we do not have the last word. But as the plaintiff urges us to consider the possibility of preemption as conditioning our interpretation of § 17A (1), we have to say that *Douglas* v. *Seacoast Prods., Inc.*, 431 U.S. 265 (1977), suggests that that possibility is remote indeed, since neither our statute nor the regulation thereunder affords any preferential treatment to in-State vessels, and prevention of "overcatching" and so on is

within the Commonwealth's police power. See *Manchester* v. *Massachusetts*, 139 U.S. 240 (1891); *Smith* v. *Maryland*, 59 U.S. (18 How.) 71 (1855).

The plaintiff complains, finally, of what it terms the "monopolistic" tendency or effect of the 1976 regulation. But this alleged iniquity is not a matter for consideration here.

The question certified is answered, "Yes." This opinion will be forwarded to the certifying court and the parties in accordance with S.J.C. Rule 3:21, § 7, 359 Mass. 790 (1971).