WORCESTER SAND & GRAVEL COMPANY, INC., & another[1] *vs.*
BOARD OF FIRE PREVENTION REGULATIONS.

Worcester.  March 6, 1987. — July 13, 1987.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Board of Fire Prevention Regulations. Blasting. Administrative Law,* Reg-
ulations, Agency's interpretation of statute, Judicial review. *Regulation.
Statute,* Construction.

A regulation adopted by the Board of Fire Prevention Regulations which
restricted blasting activities in order to protect the manufacture of micro-
electronic components, even where safety considerations were not impli-
cated, was within the scope of the authority conferred on the board by
G. L. c. 148, § 9. [466-467] LYNCH, J., and O'CONNOR, J., dissenting.
A regulation adopted by the Board of Fire Prevention Regulations which
restricted blasting activities in order to protect the manufacture of micro-
electronic components was not arbitrary or capricious on its face, absent
evidence establishing that the regulation lacked any conceivable basis
on which the board could have relied where, in light of ample evidence
before the board that excessive vibration impairs the microelectronic
manufacturing process, there was a rational basis for the vibration limits
adopted in the regulation. [467-470] LYNCH, J., and O'CONNOR, J.,
dissenting.

CIVIL ACTION commenced in the Superior Court Department
on October 12, 1984.

The case was heard by *Robert V. Mulkern,* J., on motions
for summary judgment.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.

*Roger J. Brunelle* for the plaintiffs.

*Suzanne E. Durrell,* Assistant Attorney General (*Stanley E.
Adelman* with her) for the defendant.

NOLAN, J. Worcester Sand & Gravel Company, Inc. (Wor-
cester Sand), brought an action for declaratory relief, seeking

---

[1] Michael Trotto.

400 Mass. 464                                                              465

Worcester Sand & Gravel Co. *v.* Board of Fire Prevention Regulations.

review of a regulation promulgated by the Board of Fire Prevention Regulations (board). The regulation imposed certain restraints on blasting conducted within a two and one-half mile radius of microelectronic manufacturing operations. 527 Code Mass. Regs. 13.11 (1)(e)(1984).[2] A Superior Court judge granted summary judgment in favor of the board, finding that the board had authority to promulgate the regulation and that the regulation was not arbitrary or capricious. The Appeals Court reversed, stating that the board had no authority to promulgate the regulation. *Tebo* v. *Board of Appeals of Shrewsbury*, 22 Mass. App. Ct. 618, 631 (1986). This court granted the board's application for further appellate review.[3] We now affirm the allowance of the motion for summary judgment and uphold the validity of the regulation.

The board is created pursuant to G. L. c. 22, § 14 (1984 ed.). Its fourteen members consist primarily of public safety officials and representatives of the blasting and construction industries. The board is within the Department of Public Safety but is not under the control of the Commissioner of Public Safety. In promulgating the regulation at issue, the board relied primarily on the authority provided in G. L. c. 148, § 9 (1984 ed.). Chapter 148, § 9, in relevant part provides: "The board shall make rules and regulations for the keeping, storage, use, manufacture, sale, handling, transportation or other disposition of gunpowder, dynamite, crude petroleum or any of its products, or explosive or inflammable fluids . . . or any explosives of a like nature, or any explosives, fireworks, firecrackers, or any substance having such properties that it may spontaneously, or acting under the influence of any contiguous substance, or of any chemical or physical agency, ignite, or inflame or generate inflammable or explosive vapors or gases to a dangerous extent . . . ." In a word, the statute gives the board broad authority to regulate the use of explosives, including blasting.

---

[2] The full text of the regulation in effect at the time this action was initiated is reprinted in the Appendix to this opinion.

[3] In the Appeals Court, the instant case was consolidated with two cases titled Maureen J. Tebo & others *vs*. Board of Appeals of Shrewsbury & others. Further appellate review was granted only for the instant case.

Worcester Sand concedes that the board has the authority to regulate blasting in order to protect persons, buildings, and other items of tangible property. The crux of Worcester Sand's argument is that the board's authority to issue such regulations is limited to instances where the regulations are needed to protect the public safety. We disagree. The starting point of our analysis is the language of the statute. *Simon* v. *State Examiners of Electricians*, 395 Mass. 238, 242 (1985). Although we agree with the Appeals Court that the "preoccupation" of the statute is safety, 22 Mass. App. Ct. at 629, nothing in the statute expressly limits the board to adopting regulations only where a safety concern is implicated. Instead, the statute grants the board extensive power to regulate the use of explosives. In addition, affidavits submitted to the judge indicate that the board itself has long interpreted the statute as granting it exclusive and plenary jurisdiction to regulate all aspects of blasting in the Commonwealth. The board's consistent, longstanding interpretation of its own authority is entitled to a large degree of deference. *Simon, supra* at 245 note 8, 246 note 11. Indeed, the deference given to the board's interpretation of its enabling statute is never greater than where, as here, the board must interpret a legislative policy which is only broadly set out in the governing statute. *Consolidated Cigar Corp.* v. *Department of Pub. Health*, 372 Mass. 844, 850 (1977). In this case, the board's interpretation of its own authority is not unreasonable, nor is that interpretation inconsistent with the statutory language.

Of course, not every agency regulation will be upheld simply because the regulation is not expressly prohibited by the statute. At a minimum, there must be a rational relation between the regulation and the empowering statute. *White Dove, Inc.* v. *Director of the Div. of Marine Fisheries*, 380 Mass. 471, 477 (1980), and cases cited. The requisite relation between the statute and the regulation is present here. We reject Worcester Sand's contention that the determinative issue is whether the regulation advances a public safety interest. Even though safety is a primary concern of the statute, the legislative scheme manifests a plan to protect both persons and property from

damage caused by explosives. We think the Legislature did not intend to allow the board to prevent only that property damage which poses a threat to the public safety. In certain instances, damage caused by vibrations which do not threaten the public safety may be severe. A special regulation restricting blasting vibrations is rationally related to the statutory purpose of preventing property damage from the use of explosives. Such a regulation is a proper exercise of the board's authority.

Worcester Sand further argues that, even if the board had authority to adopt the regulation in question, the regulation is still invalid because it is arbitrary and capricious. We do not agree. In challenging a regulation as arbitrary and capricious, Worcester Sand cannot carry its burden simply by showing that the administrative record does not contain facts which support the regulation. *Borden, Inc.* v. *Commissioner of Pub. Health*, 388 Mass. 707, 721-722, cert. denied sub nom. *Formaldehyde Inst., Inc.* v. *Commissioner of Pub. Health*, 464 U.S. 923 (1983). Instead, Worcester Sand must meet the formidable burden of proving the absence of any conceivable ground upon which the regulation can be upheld. *Arthur D. Little, Inc.* v. *Commissioner of Health & Hosps. of Cambridge*, 395 Mass. 535, 553 (1985). If the question is fairly debatable, we cannot substitute our judgment for that of the board. *Arthur D. Little, supra.* Our examination of the record indicates that this issue was debatable, and, therefore, we refuse to substitute our judgment for that of the board.

Our review of the administrative proceedings indicates that there was a rational basis for the vibration limits adopted in the regulation. Microelectronics experts submitted ample evidence to the board that excessive vibration impairs the microelectronic manufacturing process. Richard J. Holt[4] and Dr. Eric E. Ungar[5] both submitted letters prior to the promulgation

[4] Richard J. Holt received a master's degree in geophysics in 1956 and since 1961 has been the president of Weston Geophysical Corporation. He has prepared more than 300 individual geophysical research or engineering reports for private clients and has published many articles in the fields of geology and geophysics.

[5] Dr. Eric E. Ungar is the principal engineer at BBN Laboratories, a division of Bolt Beranek and Newman Inc. He received a doctoral degree

of the regulation at issue to the board stating that the then existing restrictions on blasting vibrations were inadequate to prevent the disruption of microelectronic manufacturing. Holt supported the adoption of a regulation proposed by Sprague Electric Company, which would have prohibited any blasting that would increase the existing vibration levels at a microelectronic manufacturing site. Ungar proposed a regulation that differed from the initial proposal supported by Holt. Ungar's proposal would have allowed blasting within three miles of a microelectronic site if the blasting would not increase existing vibration levels by more than ten per cent. Alternatively, Ungar proposed a table which would have allowed definite amounts of explosives to be used in blasting, with the amount of permitted explosives increasing as the distance from the microelectronic facility to the blasting site increased. The regulation proposed by Ungar resembles the one ultimately adopted by the board, but the permitted amounts of explosives are greater in the board's regulation than those originally suggested by Ungar. Worcester Sand relies on data submitted by Ungar in which he stated that it was impossible to determine a vibration level that would be acceptable to all microelectronic manufacturing facilities. Ungar said one level could not be established because of the difficulty in measuring building vibrations and because of the many different types of manufacturing equipment in use. Ungar also clearly stated, however, that the present blasting limits were inadequate and that it would be a mistake to say that vibrations did not have any effect on microelectronic manufacturing. In any event, Worcester Sand does not meet its burden simply by showing that there was testimony before the board which may not support the regulation. *Borden, Inc., supra* at 722.

Philip Berger[6] submitted a statement to the board on behalf of Worcester Sand in which he stated that vibrations caused

in engineering in 1957 and has been employed at BBN since 1958. He published over 200 works and has been a consultant in the design of over forty microelectronics facilities.

[6] Philip R. Berger is the executive vice president of Philip Berger & Associates, Inc. The firm has been in business since 1971 and has been involved in measuring and assessing the impact of vibration and noise produced by blasting and industrial processes.

400 Mass. 464                                    469

Worcester Sand & Gravel Co. v. Board of Fire Prevention Regulations.

by quarry blasting last only a few seconds per week. He claimed the regulation was not necessary because no microelectronic facility had ever demonstrated actual harm and because quarry operators could develop notification procedures to inform microelectronics manufacturers when blasting would take place. However, the dispute among experts over the need for additional vibration regulations simply reinforces our conclusion that this issue was debatable and properly left to the board. *Arthur D. Little, Inc., supra* at 553.

The limits adopted by the board appear to be a compromise between the proposals submitted by the microelectronics industry and the representative of the blasting industry on the board. The regulation allowed some blasting, but contained limits so that microelectronics firms would have a measure of predictability in their vibration environment. Worcester Sand claims these vibration limits are irrational because they do not take into account the geological conditions between the blast site and the microelectronic site. Whether the board ultimately adopted the best possible regulation is immaterial, however, because a regulation will not be invalidated simply because the means chosen to "achieve the statutory end is rough, illogical or not the best available." *American Family Life Assurance Co.* v. *Commissioner of Ins.*, 388 Mass. 468, 478 (1983), quoting *Shell Oil Co.* v. *Revere*, 383 Mass. 682, 687 (1981).

Worcester Sand also contends that the exceptions created by the regulation are further proof that the regulation is arbitrary. Worcester Sand argues that the vibrations caused by its quarry blasting would be no different from those caused by the excepted activities. The excepted activities include public roads, subdivision developments, temporary quarries, and existing quarries. These exceptions do not support the conclusion that the regulation is arbitrary. The board may have excepted these projects from the new vibration regulation either out of concerns for fairness or because they are in the public interest. In any event, the board is not required to adopt the best possible regulation. *Id.* at 477-478. The argument that the excepted activities produce the same vibrations as the restricted activities simply tends to show that the regulation is rough,

illogical, or not the best available. *Id*. More is required to invalidate an agency regulation as arbitrary and capricious.

*Judgment of the Superior
Court affirmed.*

APPENDIX.

Title 527 Code Mass. Regs. § 13.11 (1)(e), promulgated on September 20, 1984, reads as follows:

"*Blasting Within a 2½ Mile Radius of a Microelectronic Manufacturing Operation*. Except as hereinafter provided, no blasting shall be conducted within a two-and-one-half (2½) mile radius of a microelectronic manufacturing operation that will cause vibration velocities to exceed by more than ten percent (10%) the existing vibration velocity at said operation.

"Alternatively, blasting may be conducted in accordance with the following table:

| Radial Distance in Miles from a Microelectronic Manufacturing Operation | Maximum Charge-Weight Per Delay in Pounds |
|---|---|
| Less than .75 | 0* |
| Between .75 and 1 | 110 |
| Between 1 and 1.5 | 200 |
| Between 1.5 and 2 | 450 |
| Between 2 and 2.5 | 800 |

"Blasting may be conducted that causes vibration velocities to exceed the limits set forth above when entirely incidental to utility construction in public ways and private property, in roadwork, and in infrastructure construction. With the approval of the Marshal, blasting may also be conducted that causes vibration velocities to exceed the above limits when entirely incidental to or in connection with the construction of any structure for which a building permit has been issued or for subdivisions which have been approved under M.G.L. c. 41. For all such blasting permitted by this paragraph, reasonable notice, but in no event less than seventy-two (72) hours prior to the proposed blasting, shall be given in writing to the management of the microelectronics operation, except that lesser notice may be given in certain emergency situations under M.G.L. c. 82, § 40, the so-called 'Dig Safe Law.'

"As used herein, 'microelectronic manufacturing operation' shall mean a facility that fabricates integrated circuits; and 'existing vibration velocity

---

* No blasting permitted that increases vibration velocity at the site of a microelectronic facility by more than 10%.

at a microelectronic manufacturing operation' shall mean the vibration velocity near the base of the facility which shall be measured by placing the vibration sensors near as possible to the base of the microelectronic facility at a location nearest the blasting site. The existing vibration velocity shall be established by measuring vibration during a typical one-minute period in the absence of blasting.

"Notwithstanding anything to the contrary in 527 CMR 13.11(1)(e), active quarries which have conducted blasting on a regular basis predating the effective date of 527 CMR 13.11(1)(e) shall be exempt from all the requirements contained herein, as well as roadwork quarrying operations and temporary quarries, a temporary quarry being an operation that has been granted a three-month permit which may not be renewed without approved site development plans from a planning board."

LYNCH, J. (dissenting). I agree with the conclusion of the Appeals Court that the regulation at issue is beyond the scope of the statute and, therefore, I dissent. *Tebo* v. *Board of Appeals of Shrewsbury*, 22 Mass. App. Ct. 618, 630 (1986). I adopt this view in part for the reasons expressed by the Appeals Court, and in part because of my continuing concern over the standards of judicial review (more appropriately, the lack thereof) applicable in the Commonwealth to administrative agencies. I have expressed these views in the past, regrettably always in dissent, so that I need only comment on our practice in the context of this opinion.

The court concedes that the board's enabling statute is concerned with safety. The Appeals Court correctly concludes, *id.* at 629-630, that the regulation is concerned with economic activity and favors one type, the manufacture of electronic components, over another, quarrying rock. I, therefore, consider the scope of judicial review of the regulation of economic activity by an agency specifically authorized by the Legislature to issue regulations for the protection of public safety. I would note at the outset that not only is the enabling statute concerned with safety but it nowhere gives the board any specific authority to regulate blasting. The plaintiff concedes that blasting may be regulated for safety reasons but the court goes further and finds no impediment to the agency's regulating economic activity as well. I disagree.

Following the traditional approach in this Commonwealth, the court first applies the test whether the board's interpretation of its own authority is unreasonable. *Consolidated Cigar Corp.* v. *Department of Pub. Health*, 372 Mass. 844, 850 (1977). In order to meet that less-than-rigorous test the court has said "[t]hat no more need be discerned than some rational relation between the regulation and the empowering statute." *White Dove, Inc.* v. *Director of the Div. of Marine Fisheries*, 380 Mass. 471, 477 (1980). Not only do we require only that some tenuous basis exists between the regulation and the statute but we have placed the burden on the party challenging the regulation to show that there is no conceivable basis upon which the regulation can be upheld. *Arthur D. Little, Inc.* v. *Commissioner of Health & Hosps. of Cambridge*, 395 Mass. 535, 553 (1985). Furthermore, the agency has no obligation to say why it supports the adoption of a regulation, *Arthur D. Little, Inc., supra* at 543, or ordinarily to afford interested parties an opportunity to question adverse witnesses. Cf. *Boston Licensing Bd.* v. *Alcoholic Beverages Control Comm'n*, 367 Mass. 788, 796 (1975) (ordinarily, commission must afford interested parties an opportunity to present data, views, or arguments). In cases where the agency says that an emergency exists, there is no obligation to give any notice or even afford interested parties an opportunity to be heard. *American Grain Prods. Processing Inst.* v. *Department of Pub. Health*, 392 Mass. 309, 322-325 (1984).

Thus, the flaws inherent in the rational basis test of administrative regulation, see *Arthur D. Little, Inc., supra* at 557 (Lynch, J., dissenting), would lead me to examine the statute under which the regulations were adopted for some clear indication that the scope of the regulations is included within the legislative grant. With a succinct turn of phrase the Appeals Court suggests that "[w]hen subjected to review of validity, an administrative agency's regulation has a running start." *Tebo, supra* at 627. Not only has this court given agency regulations a running head start but the agency is running a flat race while the opposition is required to leap over hurdles, and high ones at that.

O'CONNOR, J. (dissenting). Like Justice Lynch, I agree with the Appeals Court that the regulation at issue exceeds the authority of the Board of Fire Prevention Regulations and therefore is invalid. The reasoning of the Appeals Court is right on the mark. As the Appeals Court stated, the board's "assignment" under G. L. c. 148, § 9 (1984 ed.), is to protect "the public and property generally against danger and injury from fire and explosion." *Tebo* v. *Board of Appeals of Shrewsbury*, 22 Mass. App. Ct. 618, 627 (1986). "Study of the organic statute as a whole is persuasive that its preoccupation is safety; the Department of Public Safety has the over-all responsibility for that subject matter. Fire prevention, explosion prevention, and blasting regulation have the common objective of controlling phenomena which have an inherent potential for disaster. . . . The fire board's writ to promulgate safety regulations of general applicability is surely very broad. [However] the regulation in question . . . does something quite different from protecting against hazard in the conventional sense. It proscribes blasting in certain locations irrespective of safety concerns. The blasting may threaten no lives, cause no rocks to fly, and impair no buildings. It is enough that it is within a certain distance of an occupation that wants a high degree of protection from vibration and dust. In a most attenuated way . . . the insulation of calibration equipment from vibration is a form of protection of property. The property concerned, however, is discrete and peculiarly vulnerable. The protection afforded by the regulation is not of general, but specially directed applicability. Seen realistically, what the fire board's new regulation does is to favor one form of economic activity, manufacture of microelectronic components, over another form of economic activity, quarrying rock and grading land for development. It is quite apparent that economic choice, rather than safety, underlies the regulation. The regulation tolerates existing vibration velocity; it tolerates blasting with vibration velocities in excess of specified limits if incidental to utility construction in public ways, roadwork, or infrastructure construction, and, significantly, it tolerates existing quarries even though they increase vibration velocity. Were any of those

activities unsafe, [it would be reasonable to] expect the fire board would forbid them." *Id.* at 629-630.[1] The board was not authorized to promulgate a regulation, such as the regulation in question, the purpose of which is to promote one company or industry at the expense of another. The judgment should be reversed, and a new judgment should be entered declaring the invalidity of the regulation.

---

[1] The last paragraph of 527 Code Mass. Regs § 13.11 (1) (e), reads as follows: "Notwithstanding anything to the contrary in 527 CMR 13.11 (1) (e), active quarries which have conducted blasting on a regular basis predating the effective date of 527 CMR 13.11 (1) (e) shall be exempt from all the requirements contained herein, as well as roadwork quarrying operations and temporary quarries, a temporary quarry being an operation that has been granted a three-month permit which may not be renewed without approved site development plans from a planning board."