## LIFE INSURANCE ASSOCIATION OF MASSACHUSETTS & others [1] vs. COMMISSIONER OF INSURANCE & another. [2]

Suffolk.   September 14, 1988. — November 16, 1988.

Present: WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Acquired Immunodeficiency Syndrome. Commissioner of Insurance. Insurance, Health and accident, Life insurance, Regulation. Administrative Law, Regulations. Regulation.*

The Commissioner of Insurance had no statutory authority, either express or by implication, to promulgate regulations prohibiting or restricting certain underwriting practices of insurance companies with respect to testing prospective insureds under policies of life, accident, and health insurance for exposure to the probable causative agent of acquired immunodeficiency syndrome (AIDS). [413-418]

CIVIL ACTION commenced in the Superior Court Department on September 28, 1987.

The case was heard by *Elbert Tuttle, J.*, on a motion for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*John J. Curtin, Jr. (E. Susan Garsh, Harriet E. Gould, Robert L. Quinan & Alice E. Richmond* with him) for the plaintiffs.

*Gary D. Buseck (Denise McWilliams* with him) for the intervener.

---

[1] Health Insurance Association of America, American Council of Life Insurance, Berkshire Life Insurance Company, Boston Mutual Life Insurance Company, John Hancock Mutual Life Insurance Company, Massachusetts Mutual Life Insurance Company, New England Mutual Life Insurance Company, Paul Revere Life Insurance Company, State Mutual Life Assurance Company of America, Phoenix Mutual Life Insurance Company, and Am Life Insurance Company.

[2] The intervener Gay and Lesbian Advocates and Defenders.

*William L. Pardee,* Assistant Attorney General (*Countess C. Williams,* Assistant Attorney General, with him) for the Commissioner of Insurance.

*Will J. Bangs & Joshua T. Buchman, & Gary D. Simms* of the District of Columbia, for The American Academy of Actuaries, amicus curiae, submitted a brief.

*Patrick W. Hanifin & Wayne S. Henderson,* for New England Legal Foundation, amicus curiae, submitted a brief.

WILKINS, J. On September 11, 1987, the Commissioner of Insurance (commissioner) issued regulations (211 Code Mass. Regs. §§ 36.00 et seq. [1987]) prohibiting or restricting certain underwriting practices of insurance companies with respect to testing prospective insureds for life insurance and for accident and health insurance for exposure to the probable causative agent of acquired immunodeficiency syndrome (AIDS). Less than three weeks later the plaintiffs, who write such coverages or are trade associations of companies that do, commenced this action challenging (see G. L. c. 30A, § 7 [1986 ed.]) the regulations on a number of grounds. The Gay and Lesbian Advocates and Defenders, a nonprofit legal advocacy organization, was permitted to intervene as a defendant. A Superior Court judge ordered a stay of the effectiveness of the regulations pending determination of this action.

The case was heard in the Superior Court on the plaintiffs' and the commissioner's motions for partial summary judgment. On June 7, 1988, the judge allowed the commissioner's motion on all the counts of the complaint on which the commissioner had sought summary judgment. The parties stipulated to the dismissal without prejudice of those counts of the complaint as to which summary judgment had not been sought,[3] judgment was entered for the defendants, and the plaintiffs appealed. The Chief Justice of the Appeals Court granted the plaintiffs' motion for a stay of the application and enforcement of the regulations pending appeal. See Mass. R. A. P. 6, as appearing in 378 Mass. 924 (1979). He filed a memorandum that succinctly,

---

[3] These counts concerned a claim of unlawful extraterritorial reach of the regulations and a question concerning exclusions in the regulations.

and we think correctly, identified the principal issue in this case.[4] We transferred the plaintiffs' appeal here.

The regulations state as their purpose (1) the prohibition of testing of all applicants for accident and health insurance and applicants for group life insurance for the presence of antibodies to the human immunodeficiency virus,[5] (2) the regulation of such testing of applicants for individually underwritten non-group life insurance and noncancellable disability insurance, (3) the prohibition of unfair discrimination in underwriting decisions and in deciding whom to test, and (4) the protection of privacy rights of persons who have been requested or required to submit to testing. See § 36.02. The regulations are detailed and carefully written to carry out the described purposes. The regulations do not forbid insurers from considering that a person has AIDS or has tested positive for the presence of HIV. Life insurers are expressly authorized to include AIDS exclusions in their policies (§ 36.05 [2][c]). We need not summarize the regulations in further detail.

The Secretary of the Executive Office of Consumer Affairs and Business Regulation stated at the time the regulations were proposed that "[i]nsurance companies have long operated in a context which allows them the freedom to test for any medical

---

[4] "In my opinion, the core question on which the case will rise or fall is the question of the commissioner's authority to promulgate the regulations. The regulations appear unique in at least one respect: they considerably confine the *underwriting* practices of insurers, an area which as far as I can ascertain has not been frequently entered by the commissioner in the absence of express legislative authorization. To be sure, the commissioner has framed the regulations in a manner which seeks to minimize the intrusion as much as possible, and to protect the competing interests at stake. But the fact remains that it appears to be underwriting practices, not policy provisions, that are being regulated."

[5] Human immunodeficiency virus (HIV) has been identified as the probable causative agent of AIDS. AIDS is an infectious viral disease which damages the body's immune system by destroying white blood cells. A person who has been infected with the HIV virus will develop antibodies to it. Screening tests for HIV infection are designed to detect such antibodies in the blood. To date, no test can detect the virus itself. When we refer to persons who "have HIV" or HIV antibodies, we refer to persons who have developed antibodies to the HIV virus, whether or not they have ever been tested.

condition. Our stringent restrictions on testing represent a radical departure from that norm." She added that "HIV testing, though not 100 percent predictive, is actuarially sound as a predictor of increased risk in the same way that testing for high blood pressure, diabetes or other conditions is." Although there is no agreement among experts on what proportion of those who are tested accurately and positively for the presence of antibodies to HIV will contract AIDS or develop AIDS-related complex, there is no doubt that on average the class of persons who are HIV-infected have significantly shorter life expectancies and will have substantially more illnesses than a class of persons, otherwise similar, who are not HIV-infected.

The plaintiffs' challenges to the regulations were based on a number of theories, but we need deal with only one of them: the authority of the commissioner to issue the regulations.[6] Although the regulations themselves cite many chapters of the General Laws as authority for their issuance (see § 36.01), neither the commissioner nor the intervener can point to any specific statutory language as an explicit authorization for the adoption of the regulations. The motion judge determined that the commissioner's authority to issue the regulations could be found by implication in certain statutes. See G. L. c. 175, § 3A; G. L. c. 175, §§ 110E (*d*) and 108 (8)(A) (1986 ed.). We conclude that the commissioner had no authority, express or implied, to adopt the regulations challenged in this case.

The commissioner argues that G. L. c. 175, § 3A, implicitly authorizes him to promulgate any regulation that is reasonably necessary to enable him to carry out his duties. He relies on the language in § 3A providing that the commissioner "shall administer and enforce the provisions of" G. L. c. 175. That language first appeared in G. L. c. 175 in 1924 (see St. 1924, c. 406, § 2) at a time when principles concerning administrative

---

[6] The motion judge rejected the plaintiffs' arguments that the regulations (a) violated separation of powers principles and involved agency action without adequate legislative guidance (count II), (b) were arbitrary and capricious (count III), (c) constituted an unconstitutional taking of property (count IV), (d) denied equal protection of the laws to persons not infected with HIV (count V), and (e) interfered with the insurers' common law right not to enter into contracts (count VI).

agencies were far less developed than they are today. It is doubtful that the 1924 Legislature intended by implication to authorize the commissioner to issue regulations dictating underwriting practices of insurance companies.

If, however, we were to permit the "administer and enforce" language of § 3A to expand as the acceptability of delegation of authority to administrative agencies has expanded since 1924, and if as part of the process we were to reject the suggestion in *Elmer* v. *Commissioner of Ins.,* 304 Mass. 194, 197 (1939), that the commissioner's powers are not implied but are only those expressed by statute, we would nevertheless be confronted with strong indications that no implied authority exists to adopt the regulations before us. When the Legislature has wanted the commissioner to have the authority to issue regulations, it has said so expressly. See, e.g., G. L. c. 175, § 2B (1) (readability test for policies); G. L. c. 175, § 108 (3) (g) (procedures for filing of accident and health policies); G. L. c. 175, § 110E (eliminate deceptive practices and regulate advertising of accident and health policies); G. L. c. 175, § 144 (approve mortality tables); and G. L. c. 176D, § 11 (identify acts and practices barred by G. L. c. 176D, § 3). Although the combination of specific statutory authority to issue regulations on limited subjects and the absence of a broad, general grant of rule making authority does not preclude the existence of implied authority to issue regulations on other subjects, in such cases courts give special scrutiny to an agency's assertion of implied authority to issue regulations. See *Grocery Mfrs. of Am.* v. *Department of Pub. Health,* 379 Mass. 70, 75-77 (1979).

Chapter 175 does not prescribe controls on underwriting to the same degree as the Commonwealth's insurance statutes set forth restrictions on, and controls by the commissioner over, premium charges, policy language, and disclosure of information. We think the distinction between the form and content of policies, premium charges, and the like, on the one hand, and underwriting practices (the exercise of judgment on whether to accept a risk), on the other, is significant. The commissioner has substantial regulatory authority over policy

provisions, premium charges, and the classification of risks, but (as we shall see) he has relatively little regulatory authority over underwriting practices.

The commissioner nevertheless seeks to find authority to issue these regulations (at least as to health insurance coverage) in statutory provisions concerning the content of health insurance policies. See G. L. c. 175, § 108 (8)(A) (1986 ed.) (right to disapprove the form of a policy of accident and sickness insurance in certain circumstances); G. L. c. 175, § 110E (1986 ed.) (authority by regulation to control full and fair disclosure concerning, and the form and content of, policies of accident and sickness insurance). These statutes concern unfair sales practices and the content of policies. In no way do they regulate or authorize the commissioner to regulate underwriting judgments, such as what information to acquire about a prospective insured and whether persons with certain health characteristics are to be denied coverage or placed in a separate rating classification. There is nothing in *American Family Life Assurance Co.* v. *Commissioner of Ins.*, 388 Mass. 468, cert. denied, 464 U.S. 850 (1983), construing G. L. c. 175, § 110E, to support the claim that the right to regulate policy provisions impliedly authorizes the regulation of underwriting practices. The regulations that were upheld in the *American Family Life* case were almost entirely concerned either with policy provisions (such as the diseases to be covered by health policies and the benefits to be available) or with control over rates. *Id.* at 470. In one respect only, it appears that the regulations prescribed a requirement that was arguably unrelated to policy language or rates. It directed that specific disease insurance not be sold to anyone over sixty-five. *Id.* The insurers understandably did not object to that limitation, and its lawfulness was not in contention in the *American Family Life* case.

The basic principle underlying statutes governing underwriting practices is that insurers have the right to classify risks and to elect not to insure risks if the discrimination is fair. See G. L. c. 175, § 120 (1986 ed.) (life insurance companies may not make a distinction between insureds of the same class and

equal expectation of life); G. L. c. 176D, § 3 (7) (1986 ed.) (also barring unfair discrimination between individuals in the same class and of essentially the same hazard in accident or health insurance). See also G. L. c. 175, § 193T (1986 ed.). In order to permit the kind of inquiry that is needed to evaluate risks, an insurance company is generally entitled to solicit information from prospective insureds and thereafter to deny benefits if the insured has made an intentional or material misrepresentation. G. L. c. 175, § 186 (1986 ed.). The intended result of the process is that persons of substantially the same risk will be grouped together, paying the same premiums, and will not be subsidizing insureds who present a significantly greater hazard. It is not seriously denied that persons who have HIV antibodies, as a group, are at greater risk of illness and have shorter life expectancies than those who do not have HIV antibodies. The statutory pattern authorizing insurers to discriminate fairly and to seek information from insureds in order to do so is antithetical to any implication of a right in the commissioner to forbid or limit insurers' conduct in this respect.

There are, to be sure, instances in which the Legislature has prohibited certain underwriting practices and may thereby have prescribed insurance classifications that do not reflect fair discrimination of the type we have been discussing. See G. L. c. 175, §§ 108C and 120C (persons exposed to the hazards of DES), § 120A (limited amount of insurance on life of mentally retarded person); § 108A (accident and sickness insurance, blindness or deafness), and § 120B (life insurance, blind persons); § 122 (life insurance, no discrimination based on color). Some but not necessarily all of these groups may have life expectancies and tendencies toward illness that are on average significantly worse than those of persons not in these groups. To that extent these statutes run contrary to the insurer's general right to discriminate fairly. These specific prohibitions tell us that the Legislature knows how to regulate underwriting practices. They do nothing toward providing an implied authority to issue the regulations in this case.

In light of a general legislative policy of requiring fair classifications of risks and of permitting insurers to decide whom to

insure (with certain exceptions explicitly set out by statute), it is not reasonable to conclude that the Legislature intended the commissioner to have an implied right to regulate underwriting practices with respect to investigating and insuring persons who may have HIV. If we were to accept the commissioner's argument that he had implied authority to issue these regulations governing the underwriting practices of insurance companies, it is hard to see what restrictions there would be on the commissioner's right to control any and all activities of insurers by regulation.[7]

What we have decided is consistent with our opinions concerning the implied authority of administrative agencies to promulgate regulations. We have often been receptive to arguments in support of an implied agency authority to issue regulations. Some would say we have been too receptive. See *Worcester Sand & Gravel Co.* v. *Board of Fire Prevention Regulations*, 400 Mass. 464, 471 (1987) (Lynch, J., dissenting); *id.* at 473 (O'Connor, J., dissenting). When we have found an implied authority to issue regulations, however, there has always been at least a rational relationship between the regulation and the purpose of the statute that we viewed as authorizing the regulation. See *id.* at 466 (statute authorizing regulations concerning use of explosives permits regulation concerning blasting not threatening to public safety); *Grocery Mfrs. of Am.* v. *Department of Pub. Health*, 379 Mass. 70, 76 (1979) (in the absence of grant of general rule making authority, statute specifically authorizing regulations concerning misbranded food supports regulations requiring disclosure of last date of appropriate use); *Levy* v. *Board of Registration & Discipline in Medicine*, 378 Mass. 519, 526 (1979) (regulation making conviction of a crime a basis for discipline authorized by statute broadly permitting agency to adopt "regulations governing the practice of medicine in order to promote

---

[7] Persons with AIDS or having HIV antibodies are not in a classification protected against discrimination by the State Constitution (see art. 1 of the Declaration of Rights), and thus we are not presented here with the question of the commissioner's authority to enforce constitutional protections by regulation, even in the absence of statutory authority.

the public health, welfare, and safety"). See also *Commonwealth* v. *McDuffee*, 7 Mass. App. Ct. 129, 138, rev'd on other grounds, 379 Mass. 353 (1979) (Commissioner of Insurance with authority over brokers' renewal applications had authority to require that statements be made under oath). A major difficulty with the commissioner's argument here is that there is no statute authorizing the promulgation of regulations that has any relationship to the regulations that he issued. An implication of authority cannot arise from a statutory vacuum. We apply no new or different principle in deciding this case. The circumstances of these regulations simply put them in a different (i.e., unauthorized) category from the regulations upheld in the cases we cite above.[8]

Our decision, of course, has nothing to do with the substantive merits of the regulations or with the need for their adoption. The commissioner has sought in good faith to deal with one aspect of an important public health problem. Even if we were to agree that the challenged regulations are desirable, or at least that the commissioner was well justified in his discretion in thinking so, this court lacks the power to provide the authority for their promulgation. It is now for the Legislature to decide what, if any, authority it will give to the commissioner to regulate the underwriting practices of life, health, and accident insurers.[9]

---

[8] The commissioner has not argued that, if the regulations in large measure lack statutory authorization, certain identified provisions (possibly those concerned with the confidentiality of information) might be valid as regulations concerning unfair acts or practices, authorized by G. L. c. 176D, § 11 (1986 ed.). The issue is not before us when the author of the regulation does not advocate such a result.

[9] If the Legislature were expressly to authorize the promulgation of regulations such as are before us in this case, many of the plaintiffs' other challenges to the regulations would either lose force or would have to be recast. For example, the plaintiffs' arguments that the regulations violate separation of powers principles and are an unconstitutional exercise of legislative power would disappear. If the Legislature were expressly to authorize a regulation such as § 36.11 requiring an insurer to pay for certain pretest and posttest counseling of an applicant for insurance, any successsful claim that such a requirement is an unconstitutional taking would have to show that an insurer could not protect its interests, for example, through an adjustment in its premium charges.

The judgment for the defendant commissioner is vacated and the case is remanded for entry of a judgment declaring that the regulations governing "HIV-Related Testing and the Use of AIDS-related Information for Life and Health Insurance" (211 Code Mass. Regs. §§ 36.00 et seq. [1987]) are void because the Commissioner of Insurance lacked authority to issue them.

*So ordered.*