MASSACHUSETTS RENTAL HOUSING ASSOCIATION, INC., &
others[1] *vs.* LEAD POISONING CONTROL DIRECTOR & another.[2]

No. 98-P-600.

Suffolk. December 8, 1999. - June 8, 2000.

Present: KASS, GREENBERG, & BECK, JJ.

*Lead Poisoning. Department of Public Health.*

Discussion of G. L. c. 111, §§ 189A-199B, the Lead Law, which provides
statutory authority to the Department of Public Health to promulgate
regulations to prevent, screen, diagnose, and treat lead poisoning. [360-361]
There was ample rational basis to support a regulation promulgated by the
Lead Poisoning Control Director that designated a particular chemical test
involving sodium sulfide for the detection of the presence of lead in
residential premises [361-362]; and certain statements in standard notifica-
tion forms prepared by the director and directed to prospective residential
tenants were factually accurate and legally correct [362-364].

CIVIL ACTION commenced in the Superior Court Department on
August 21, 1995.

The case was heard by *John C. Cratsley*, J., on motions for
summary judgment.

*David M. Governo* for the plaintiffs.

*Jane L. Willoughby*, Assistant Attorney General, for the
defendants.

KASS, J. Several trade associations[3] and two rental property
owners challenge by a declaratory judgment action the accuracy

[1]Rental Housing Association of Greater Springfield, Inc.; Greater Holyoke
Rental Housing Association, Inc.; Paul D. Lessard; and Thomas M. Cornet.

[2]The Massachusetts Childhood Lead Poisoning Prevention Program, a non-
statutory bureau within the Department of Public Health.

[3]The trade associations have standing to participate in the action as their
individual members can assert a cognizable interest within the area of regula-
tory concern. *Massachusetts Assoc. of Indep. Ins. Agents & Brokers, Inc.* v.
*Commissioner of Ins.*, 373 Mass. 290, 296-298 (1977). *Animal Legal Defense*

of a chemical test (sodium sulfide) prescribed by the Lead Poisoning Control Director of the State Department of Public Health (Director) to detect the presence of lead in residences. They challenge, as well, three notices to the public that the Director has published about lead poisoning hazards. A Superior Court judge, considering the complaint on a motion for summary judgment, allowed summary judgment in favor of the Director. We affirm.

1. *Facts and statutory framework.* By St. 1971, c. 1081, the Legislature enacted a statutory scheme, now appearing as G. L. c. 111, §§ 189A through 199B (Lead Law), to prevent lead poisoning and to control its sources. Section 190 of the Lead Law, as amended by St. 1993, c. 482, § 3, conferred upon the Department of Public Health a broad mandate to "establish a statewide program for the prevention, screening, diagnosis and treatment of lead poisoning." In aid of that program, the Director received authority in § 190 to issue regulations.

Paint that contains dangerous levels of lead and was applied to the walls and ceilings of residences in which children live is a particular target of the Lead Law. See G. L. c. 111, § 194. "The means of detection and the amount of lead in the paint, plaster or other accessible structural material that produces the danger of lead poisoning shall be determined by regulation by the [D]irector in accordance with sound medical practice and current technical knowledge." *Ibid.,* as amended by St. 1993, c. 482, § 5. The Director by regulation specified two acceptable methods of testing for dangerous levels of lead: (1) with a mobile x-ray flourescence analyzer; and (2) with a 6-8% sodium sulfide solution. 105 Code Mass. Regs. § 460.740 (1995). It is the efficacy of the sodium sulfide test in light of "current technical knowledge" that the plaintiffs contest.

In addition to requiring the Director to mount and maintain a campaign of lead paint removal, the Legislature also charges the Director with educating the general public, and particularly purchasers and prospective tenants of residential property, about the sources and signs of lead poisoning, and legal rights and remedies under the Lead Law. See G. L. c. 111, §§ 192, 192B, and 197A. In that connection, the plaintiffs complain that two announcements the Director has made are wrong as matter of

*Fund, Inc.* v. *Fisheries & Wildlife Bd.,* 416 Mass. 635, 638 & n.4 (1993). *Massachusetts Assn. of Cosmetology Schs., Inc.* v. *Board of Registration in Cosmetology,* 40 Mass. App. Ct. 706, 708 (1996).

fact and that a third is incorrect as matter of law. We shall quote the language of those announcements when we discuss below whether the record on summary judgment was sufficient to resolve their accuracy and lawfulness.

2. *The sodium sulfide test*. This lead detection procedure works by applying drops of a 6-8% sodium sulfide solution to a dry paint sample (in the form of chip, film, or powder). If the solution turns the paint sample light to dark gray or black, that is an indicator of the presence of lead in a concentration greater than 0.5%. 105 Code Mass. Regs. § 460.740(2) (1995). American Society for Testing and Materials, Standard Practice for Use of Qualitative Chemical Spot Test Kits for Detection of Lead in Dry Paint Films (1995). Advantages of the sodium sulfide test are that it is quick, easy, and relatively cheap. Among disadvantages of the test are that sodium sulfide smells bad (like rotten eggs), and that it reacts with several other metals, including iron, nickel, cobalt, copper, mercury, and molybdenum. The test will, therefore, produce false positives. *Ibid.*

On behalf of the plaintiffs, there are affidavits in support of their summary judgment motion that the sodium sulfide test for lead is old hat and produces an impermissibly high rate of false positives, to the detriment of property owners who will be put to needless lead removal expense when the level of lead is low or there is no lead at all. What the plaintiffs would have us draw from their offerings is that they have put in dispute, for summary judgment purposes, whether the Director's regulation authorizing use of a sodium sulfide test is "in accordance with sound medical practice and current technical knowledge," as § 194 requires. The major hurdle the plaintiffs confront — as they concede — is that, if the factual basis of a regulation is fairly debatable, courts in Massachusetts defer to the regulator's resolution of that debate. *Druzik* v. *Board of Health of Haverhill*, 324 Mass. 129, 138-139 (1949). *Borden, Inc.* v. *Commissioner of Pub. Health*, 388 Mass. 707, 722-723, cert. denied, 464 U.S. 936 (1983). Cella, Administrative Law & Practice § 774 (1986).

There are in the record an affidavit from a qualified expert and technical notes, professional journal articles, and standard practices of the American Society for Testing Materials (introduced through the affidavit) that speak to the convenience, economy, and reliability of the sodium sulfide test. The resultant conflict in the evidence about the merits of the sodium sulfide

test did not, in the context of reviewing an administrative regulation, leave a material fact in dispute. It was the duty and prerogative of the Director to sift among the conflicting claims and to determine whether the sodium sulfide test had sufficient merit to warrant its continued status as one of the tools that inspectors could use to test for dangerous levels of lead. We defer to the Director's decision unless, as the *Druzik* opinion and some of its progeny (perhaps with a touch of hyperbole) have articulated the standard of review, there was no conceivable basis on which the regulation could be upheld. See, e.g., *Purity Supreme, Inc.* v. *Attorney Gen.*, 380 Mass. 762, 776 (1980); *Worcester Sand & Gravel Co.* v. *Board of Fire Prevention Regulations*, 400 Mass. 464, 467 (1987). In the instant case, there was ample rational basis for the sodium sulfide test: its convenience, its economy, and its endorsement by other testing authorities.

3. *The notices to the public.* General Laws c. 111, § 197A, requires the Director to prepare standard notification forms that warn purchasers of residential property, rental and nonrental, about the hazard of lead paint and similarly warn prospective tenants. In furtherance of that duty the Director in 1995 published a standard notification form directed to prospective tenants that included the following:

(1) "A home with lead paint must be deleaded for a lead poisoned child to get well."

(2) "Remember, the only way to permanently lower the risk of your child getting lead poisoned is to have your home deleaded if it contains lead paint."

Those statements are factually inaccurate, the plaintiffs urge, because there are other sources of lead poisoning, e.g., contaminated soil or water and toys. No reasonable person reading the statements with which the plaintiffs quarrel could conclude that lead paint is the *only* source of lead poisoning. Indeed, preceding sentences in the notification form explain that a child can get lead from other sources such as soil but that "these rarely cause lead poisoning by themselves." As to the first of the two sentences under attack, there is affidavit material in the record for the rather obvious proposition that children already sick with lead poisoning have a better chance of recovery if they do not live in a residence where they may

ingest more lead. Similarly, there is affidavit material that the motion judge could credit which stands for the equally obvious proposition that a lead-free living environment will permanently lower the risk of lead poisoning because the risk of lead ingestion for children under six is more persistent in the home than in the general environment.

The same principles that applied to the sodium sulfide test apply here. Just because the notification statements, if read very literally, may be debatable does not subject those statements to invalidation on judicial review. See *Borden, Inc.* v. *Commissioner of Pub. Health*, 388 Mass. at 729.

The last provision in the notification statement that the plaintiffs challenge reads as follows:

> "What does the Lead Law require the owner of your home to do if a child under six years old lives there? The owner of a home built before 1978 must have the home inspected for lead if a child under six years old lives there."

According to the plaintiffs, the Lead Law does not impose a positive obligation of inspection. While there is no direction in the statute requiring owners to make prophylactic inspections, § 197(*a*) of the Lead Law, as amended by St. 1993, c. 482, § 8, provides that:

> "Whenever a child under six years of age resides in any premises in which any paint . . . contains dangerous levels of lead, the owner shall abate or contain said paint . . . in accordance with the requirements of subsections (b) or (c)."

As a practical matter, it is hard to think how an owner of property could generally comply with the deleading requirement of G. L. c. 111, § 197, unless that owner first inspects for the presence of lead paint. The purpose of the notification statement is to give pragmatic advice in simple language, and, in that light, the notification statement is a reasonable summary of what an owner of property must do in order to conform to § 197. The notice also serves the education function set out in §§ 192 and 192B, which we have previously discussed. We are not prepared to declare the statement about inspection of pre-1978 homes as unlawful because the statute does not literally prescribe that owners make such an inspection.

The defendants' motion for summary judgment was rightly allowed, and the plaintiffs' motion for summary judgment was correctly denied. The judgment of dismissal is vacated, and a judgment shall enter declaring that the regulation authorizing the sodium sulfide test is valid, and that the statements in the tenant notification form are factually accurate and legally correct. See *146 Dundas Corp.* v. *Chemical Bank*, 400 Mass. 588, 589 n.4 (1987); *Gennari* v. *Revere*, 23 Mass. App. Ct. 979, 980 (1987).

*So ordered.*