Neel, Stephen E., J.
Plaintiffs Sea Rover Fishing, Inc., Kathryn Ann Fishing, Inc., North Queen Fishing, Inc., and Leonard Ingrande (collectively, plaintiffs) move for (1) an order enjoining the defendant, Paul Diodati, Director of the Massachusetts Division of Marine Fisheries (Director), from implementing a condition on permits that prohibits purse seining for Atlantic bluefin tuna (bluefin tuna) in Cape Cod Bay for the 2008 season; and (2) summary judgment declaring the rights of the parties. Both motions are based on plaintiffs’ contention that the prohibition imposed by the permit condition is beyond the Director’s authority and is preempted by federal law. After hearing, and consideration of the parties’ submissions, the plaintiffs’ motion for preliminary injunction will be denied, and declaratory judgment will enter for defendant.
BACKGROUND
The following facts are taken from the parties’ Statement of Agreed Facts (SAF). Plaintiffs Sea Rover Fishing, Inc., Kathryn Ann Fishing, Inc., and North Queen Fishing, Inc.,[4] are licensed to participate in the United States’ and Commonwealth of Massachusetts’ bluefin tuna fisheries by means of purse seines. Blue-fin tuna is a tuna species classified as highly migratory, with a wide commercial market both in the United States and abroad. Purse seiners catch “large medium” (73 inches or longer) and “giant” (81 inches or longer) bluefin tuna, which sell for between $6 and $25 per pound, depending on quality and market conditions.
A purse seine is a large fishing net that hangs vertically in the water, suspended by floats around the top and weights along the bottom. Purse seiners use spotter pilots to locate schools of bluefin tuna. Once the purse seine vessel reaches the location, a small skiff is used to place (“set”) the net in a circle surrounding the fish. A rope that passes through rings at the bottom of the seine is then closed, which “purses” the net, preventing the fish from escaping. The purse seine method is used in the open ocean and in enclosed bays.
1. The Federal Statutory and Regulatory Scheme
Bluefin tuna fishing is highly managed and regulated by means of comprehensive international, federal, and state statutory and regulatory schemes that date from 1966, when the International Convention for the Conservation of Atlantic Tunas (the Convention) was adopted to protect Atlantic tuna species through international cooperation. Bluewater Fisherman’s Assoc. v.Mineta, 122 F.Sup.2d 150, 157-58 (D.D.C. 2000). That year the Food and Agriculture Organization of the United Nations sponsored an international conference, which resulted in the International Commission for the Conservation of Atlantic Tunas (the Commission), established in accordance with the Convention.
As a member of the International Commission, the United States participates in annual conferences where the Commission recommends the total allowable catch for bluefin tuna and what percentage of this catch, or quota, is permitted for each member nation. At any given time, the Commission can recommend, based on various factors considered in allocating member quotas, that the remainder of one member’s quota that was not taken be transferred to another member. For example, in 2007 and 2008 the Commission recommended that a certain amount of the United States’ underharvest be allocated to Mexico.
*388 The United States implements the recommendations of the International Commission pursuant to the Atlantic Tunas Convention Act (ATCA), 16 U.S.C. §971 et seq., enacted in 1975. Under the ATCA, the Secretary of Commerce is authorized to promulgate regulations to carry out the purposes and objectives of the Convention. 16 U.S.C. §971d(c)(3). Also an integral part of the statutory scheme is the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. § 1801 et seq., enacted to conserve and manage fishery resources; promote domestic commercial and recreational fishing under sound conservation and management principles; provide for the preparation and implementation of fishery management plans which will achieve and maintain optimum yield from each fishery; and promote the protection of essential fish habitat. 16 U.S.C. §1801(b)(l) etseq.
Pursuant to both ATCA and the Magnuson-Stevens Act, the National Marine Fisheries Service (NMFS), a federal agency under the purview of the National Oceanic and Atmospheric Administration and the Department of Commerce, regulates and manages all highly migratory species fisheries, which includes the bluefin tuna fishery. The NMFS reviews comparable state regulations to determine whether those applicable to bluefin tuna are at least as restrictive as the federal regulations and are effectively enforced. 50 Code Fed. Regs. §635.1.
The NMFS regulations also set forth a variety of restrictions and limitations designed to manage and conserve the bluefin tuna fishery, including gear operation and deployment restrictions, 50 Code Fed. Regs. §635.21; retention limits for the purse seine category of fifteen percent, by weight, of the total amount of giant bluefin tuna landed during that fish-ingyear, 50 Code Fed. Regs. §635.23(e)(l); a quota, for the purse seine category, of 18.6 percent of the annual United States quota, 50 Code Fed. Regs. §635.27(a)(4)(I);[5] delay of the season start date for purse seine fishing from July 15 to no later than August 15 (taking into consideration, among other things, gear conflicts on the fishing grounds and market impacts due to oversupply), id.; and area closures in response to the seasonal distribution, abundance, or migration patterns of bluefin tuna, 50 Code Fed. Regs. 635.28(a)(3). See also 50 Code Fed. Regs. §635.34 (providing for the adjustment of management measures).
2. The Massachusetts Statutory and Regulatory Scheme
In 1974, the Massachusetts Division of Marine Fisheries (the Division) promulgated its own set of regulations governing the taking, landing, and sale of bluefin tuna. 322 Code Mass. Regs. 6.04(1). After the ATCA was passed in 1975 and the federal regulations thereunder made applicable within Massachusetts waters, Massachusetts in 1976 deleted all of the 1974 regulations with the exception of the limit on the number of purse seine vessels, and extended earlier grandfather provisions to cover those purse seine vessels in operation prior to 1974. 322 Code Mass. Regs. 6.04(1). General Laws c. 130, §1B, established the Massachusetts Marine Fisheries Advisory Commission (the Advisory Commission), a nine-member commission that represents Massachusetts recreational, commercial, processing, and seafood dealer fishing interests. Pursuant to G.L.c. 130, §17A, the Advisory Commission must approve or disapprove all proposed regulations. In addition, in response to increased fishing and the resulting sharp decline in many of the most important fisheries, the Advisory Commission is charged with adopting conservation and management strategies to cap fishing in state waters, and in particular to address the mobile gear fishers (which include purse seiners) whose ability to catch large numbers of fish has a major impact on inshore resources. 322 Code Mass. Regs. §8.01.
The 1976 regulations were superseded in 1988 by the current regulations, 322 Code Mass. Regs. §6.04, promulgated by the Division with the approval of the Advisory Commission and the Commissioner of Fisheries, Wildlife and Environmental Enforcement in accordance with G.L.c. 130, §17A. The Division also promulgated regulations covering the form, use, and contents of all Massachusetts fishery permits, including those for bluefin tuna, codified in 322 Code Mass. Regs. §7.01.
3. Purse Seining in Cape Cod Bay
Purse seine fishing for bluefin tuna is prohibited anywhere in Massachusetts waters prior to September 1. 322 Code Mass. Regs. §6.04(3)(c). More specifically, and relevant to the motions before the Court, §§6.04(3) (d) and (e) impose the following additional restrictions on purse seine fishing in Cape Cod Bay:
(d) vessels may not fish for[6] tuna within Cape Cod Bay [as defined herein] . . . during any weekend, defined as the 48 hour period beginning on Friday midnight and ending on Sunday midnight, and during any Massachusetts or federal holiday, during the period September 1 through September 30, except that 322 CMR 6.04(3)(d) shall not apply when the federal tuna quota in the general category has been reached per notification of National Marine Fisheries Service; and
(e) vessels may not fish for tuna from September 1 through September 15 within [a specified area within Cape Cod Bay] . . . except that 322 CMR 6.04(3)(e) shall not apply when the federal tuna quota in the general category has been reached per notification of the National Marine Fisheries Service.
In addition to imposing the above restrictions, §6.04(4)(c) allows the Director to impose conditions on fishery permits as follows:
*389 Conditions. Each regulated fisheiy permit issued may be accompanied by a Statement of Conditions to be determined by the Director relative to the use of the permit. Said conditions may include, but are not limited to:
1. the days or hours in which tuna fishing may be authorized; [and]
2. the areas where tuna fishing may be authorized!.]
It is pursuant to the above regulation that the Director imposed the permit condition at issue here.
The parties do not dispute that Cape Cod Bay has historically been one of the primary fishing locations for bluefin tuna, which gather there in seinable numbers during the late summer and early fall fishing season. However, plaintiffs claim that the Bay is the only feasible place in which to seine for bluefin tuna, and that the condition precluding them from fishing there effectively shuts them out of the bluefin market. The Director, on the other hand, claims that seiners can access sufficient schools of tuna in Massachusetts waters other than Cape Cod Bay, as well as in international waters.
Plaintiffs point to the fact that tuna seined in the Bay have always been larger, and thus more valuable, than bluefin tuna caught elsewhere.[7] Not surprisingly, as a result, there is significant competition between, in particular, the large purse seining vessels, which can catch whole schools in one net, and other gear users, whose smaller vessels and handheld gear limit their catch to one tuna at a time.
The user conflict between handgear users and purse seiners in Massachusetts dates back as far as 1939.[8] More recently, members of the general, angling, and harpoon categories, citing user conflicts, have urged NMFS to adopt regulatory measures precluding purse seining in Cape Cod Bay. To date, NMFS has not acted upon these requests, but has indicated that future rulemaking may “address the entire range of purse seine comments that were received . . .” SAF, Ex. 6 (71 Fed.Reg. 58105 (Oct. 2, 2006)).
The Division and the Advisory Commission have adopted numerous regulations designed to limit user conflict in Massachusetts waters, including the above-cited 322 Code Mass. Regs. 6.04(3)(d) and (e). See also 322 Code Mass. Regs. 4.02(1) (regulation that manages net fishing participation in inshore waters “designed to reduce conflicts between different fisheries and users and to regulate all inshore net fisheries for purposes of resource conservation and management”).
In recent years, both the Division and the Advisory Commission have received petitions from the General Category Tuna Association (GCTA) seeking to amend the bluefin tuna regulations to prohibit purse seining in Cape Cod Bay. In 2004, the Director submitted apropos al to the Advisory Commission that would prohibit purse seining for bluefin tuna “except and during those times that the General Category quota is reached in any given year.” SAF, ¶51. The Advisory Commission declined to act on the Director’s proposal.
In September 2005, the Massachusetts Environmental Police received two calls from an NMFS special agent reporting that complaints had been received concerning conflicts in Cape Cod Bay between purse seiners and harpooners. In 2006, GCTA again petitioned the Division to close the Bay to seiners. Concerned about the decreased supply of tuna and increased conflict, the Director in February 2006 submitted a renewed proposal to prohibit purse seining for tuna in Cape Cod Bay until the general category quota was filled. As before, the Advisory Commission declined to approve or disapprove the Director’s proposal, but instead voted to impose a one-year prohibition on purse seining in the Bay, except when the general category quota had been reached, to expire on December 31, 2006.
In the absence of any further action by the Advisory Commission, purse seining resumed as before during the 2007 season. Noting the declining bluefin tuna population in the Bay, and concerned about user conflict during the 2008 season, the Director informed the Advisory Committee by memorandum dated July 27, 2007 (SAF, Ex. 9), that he intended, pursuant to 322 Code. Mass. Regs. §6.04(4)(c), to impose as a condition on any purse seine permit for the 2008 season a one-year prohibition against seining for blue-fin tuna in Cape Cod Bay.
The Director followed this with a second memorandum, dated October 9, 2007 (SAF, Ex. 10), in which he noted the reduction in both numbers of bluefin tuna and prospects for replenishment, consistent with the general decline in commercial landings, and stated his opinion that seining in Cape Cod Bay was at that time an unsustainable practice. In light of that, the Director announced again his intention to impose a ban during the 2008 season by means of a permit condition, consistent with other Massachusetts fishing regulations “implemented as solutions to allocation and user conflict.” Id. On February 28, 2008, in response to a letter from Ingrande inquiring whether conditions would be imposed on the permits for his three purse seine vessels, the Director issued a Statement of Conditions to all three 2008 permits (condition), prohibiting plaintiffs from purse seining in Cape Cod Bay.
The plaintiffs then filed this action and moved for injunctive and declaratory relief. In view of the approaching September 1 start date for the 2008 purse seine season, the parties requested, and the Court agreed to, an expedited schedule for resolution of plaintiffs’ motions.
*390 DISCUSSION
The plaintiffs present two arguments. First, they contend that the Director failed to comply with mandatory procedures for the repeal or amendment of the Division’s regulations, and thus acted without authority, by unilaterally imposing a permit condition that negates an existing regulation. Second, they contend that the moratorium imposed by the condition conflicts with the federal scheme for the management of bluefin tuna, and is thus preempted and unenforceable. They ask the Court to enjoin the Director and the Division from implementing the condition, and to enter summary judgment declaring it invalid.
1.The Preliminary Injunction Standard
In order to succeed on their motion for a preliminary injunction, the plaintiffs bear the burden of proving “(1) a likelihood of success on the merits at trial; (2) that irreparable harm will result from the denial of the injunction; and (3) that the plaintiffs irreparable harm outweighs any harm the opposing party would suffer if the injunction were granted.” Tri-Nel Mgmt., Inc. v. Board of Health of Barnstable, 433 Mass. 217, 219 (2001); Packaging Indus. Group Inc. v. Cheney, 380 Mass. 609, 617 (1980).
Where, as here, the dispute is between a public entity and a private party, the court charged with balancing the risk of harm to each party should also consider the risk of harm to the public should the injunction issue. Biotti v. Board of Selectmen of Manchester, 25 Mass.App.Ct. 637, 639 (1988). “(B]efore issuing a preliminary injunction, a judge is required to determine that the requested order promotes the public interest, or, alternatively, that the equitable relief will not adversely affect the public.” Commonwealth v. Mass. CRINC, 392 Mass. 79, 89 (1984). See also GTE Prods. Corp. v. Stewart, 414 Mass. 721, 723 (1993) (“[i]n an appropriate case, the risk of harm to the public interest also may be considered”). See also Cote-Whitacre v. Department of Pub. Health, 446 Mass. 350, 357 (2006).
2.The Summary Judgment/Declaratory Judgment Standards
Summary judgment will be granted where, viewing the evidence in the light most favorable to the non-moving party, all material facts have been established and the moving party is entitled to judgment as a matter of law. Cabot Corp. v. AVX Corp., 448 Mass. 629, 636-37 (2007); Mass.R.Civ.P. 56(c). The moving party bears the burden of demonstrating affirmatively the absence of a triable issue. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989).
A complaint for declaratory relief “is the proper vehicle to challenge the legality of an administrative action ‘even though such action is neither an adjudication nor the promulgation of a rule,’ so long as the prerequisites to bringing a declaratory judgment action are met.” Naranjo v. Department of Rev., 63 Mass.App.Ct. 260, 266 (2005), quoting Haverhill Manor, Inc. v. Commissioner of Public Welfare, 368 Mass. 15, 30 (1975). In order to entertain such a complaint, a court must determine that an actual controversy exists, and that the plaintiff has the requisite legal standing to secure its resolution. G.L.c. 231A, §1 et seq.; Massachusetts Assn. of Indep. Ins. Agents & Brokers, Inc. v. Commissioner of Ins., 373 Mass. 290, 292 (1977); Gallipault v. Wash Rock Inv., LLC, 65 Mass App Ct. 73, 83 (2005). The purpose of these requirements “is to ensure the effectuation of the statutory purpose of G.L.c. 231 A, which is to enable a court to afford relief from . . . uncertainty and insecurity with respect to rights, duties, status and other legal relations.” Id. at 84; see also G.L.c. 231A, §9. “Such proceedings are concerned with the resolution of real, not hypothetical, controversies; the declaration issued is intended to have an immediate impact on the rights of the parties.” Gallipault, 65 Mass.App.Ct. at 84. The Court is satisfied that the complaint here meets these requirements.
3.The Director’s Authority
The Court’s analysis of the Director’s authority begins with the plain words of the regulation at issue, read as a whole in order to produce internal consistency. See Daveiga v. Boston Public Health Comm’n, 449 Mass. 434, 440 (2007). A court may not add words to a regulation or ignore portions thereof, particularly where the court can make good sense of the regulation as written. See Cooney v. Compass Group, 69 Mass.App.Ct. 632, 638 (2007).
Plaintiffs acknowledge that the plain words of 322 Code Mass. Regs. §6.04(4)(c) give the Director the authority to impose conditions on purse seining permits, including conditions on the times and places where bluefin tuna fishing may be conducted. Nevertheless, plaintiffs assert that the Director exceeded his authority when he prohibited them from purse seining in Cape Cod Bay for the 2008 season, arguing that the prohibition nullifies §§6.04(3) (d) and (e). Thus, plaintiffs conclude, the Director’s action constitutes both a new regulation and a repeal of §§6.04(3) (d) and (e): because the Director imposed the condition unilaterally, they argue, it was promulgated and implemented without notice, hearing and the approval of the Advisory Commission, in violation of the requirements of G.L.c. 130, §17A.
The Court disagrees with plaintiffs’ conclusion, and concludes instead that the condition neither constitutes a new regulation, nor impermissibly contradicts §§6.04(3)(d) and (e). As to the latter point, §§6.04(3)(d) and (e) impose limits on the time periods within which purse seiners have access to Cape Cod Bay; they do not, either expressly or impliedly, state that the Director, in his discretion, may not impose further limits in a particular year, *391 acting under the express authority granted him by §6.04(4) (c) (2) to impose conditions onthe days or areas where fishing maybe authorized.
As to the argument that the condition on plaintiffs’ permits constitutes an invalid regulation, the Director points out that the condition imposes no permanent restriction where it attaches to a permit for the 2008 season only.[9] Plaintiffs’ understandable concern that the Director will continue to impose this condition in subsequent years notwithstanding, the Director’s condition on seining in 2008 cannot — at this point, at least[10] — be said to be “a rule, regulation, standard or other requirement of general application and future effect.” Haverhill Manor, Inc. v. Commissioner of Pub. Welfare, 368 Mass. 15, 21 (1975) (citation omitted). On the contrary, the Court concludes that the condition is “an administrative expedient,” id., undertaken to address immediate concerns about sustainability, allocation, and user conflict.[11]
Accordingly, the Director’s condition to plaintiffs’ permits is neither a regulation nor an appeal of a regulation, and the notice, hearing, and approval requirements of G.L.c. 130, §17A are inapposite. See also Department of Pub. Health v. Cumberland Cattle Co., 361 Mass. 817, 828 (1972) (an enforcement order not a regulation but an administrative directive).
Plaintiffs next argue that the adoption of §§6.04(3)(d) and (e) resulted from and reflects a “compromise” between purse seiners and handgear users intended to allow seiners limited, but meaningful, access to Cape Cod Bay, and that the condition derogates from that intent. The Court concludes that the argument is unpersuasive, unsupported in the record, and contraiy to the plain language of the regulations.
Conflict between purse seiners and handgear users “may be called traditional.” White Dove v. Director of Div. of Marine Fisheries, 380 Mass. 471, 476 n.7 (1980). See also Corsa v. Tawes, 149 F.Sup. 771, 776 (D.Md. 1957) (ongoing conflict between purse netters and sports fishermen). The plaintiffs have produced no evidence that, prior to 1989, when the current regulations were last amended, there was any agreement or compromise among the various factions that was considered by either the then-Director, the Division, or the Advisoiy Committee.[12] Moreover, the regulation is replete with language indicating that its intent was to limit purse seining in order to reduce user conflict. For example, section (3)(d) recites that “vessels may not fish for tuna . . .” on weekends and holidays in September (emphasis added); in like manner, section (e) provides that “vessels may not fish for tuna” before September 15 in designated areas (emphasis added). The language, which is prohibitory rather than permissive, speaks not to compromise but to restriction.
The Director’s Declaration, at 9-10, underscores the regulatory history belying plaintiffs’ compromise argument.
While abandoning for the moment [i.e., in 1988] the goal [of the 1974 and 1976 regulations] of phasing out the purse seine fishery that had been pursued by previous Directors, Director Coates included a regulatory provision designed to ensure that user conflicts would be minimized in Cape Cod Bay by authorizing the Director to condition the purse seine regulated fishery permits by authorizing when, where and how the purse seine fishing vessel would conduct fishing operations in Massachusetts waters.
In any event, even if §6.04 were to be held to reflect a compromise between purse seiners and handgear users, that compromise, as set forth in the regulation, includes 6.04(4) (c), allowing the Director the discretion to condition the use of purse seine permits from year to year.
Even though the issues before the Court are not brought under G.L.c. 30A, the foregoing discussion of the regulations and the Director’s authority thereunder is consonant with the deference normally afforded an administrative agency in the interpretation of its own rules. “An agency’s interpretation of its own regulation and statutory mandate will be disturbed only if the interpretation is patently wrong, unreasonable, arbitrary, whimsical, or capricious.” Box Pond Assoc. v. Energy Facilities Siting Bd., 435 Mass. 408, 416 (2001), quoting TBI, Inc. v. Board of Health of N. Andover, 431 Mass. 6, 17 (2000) (internad quotations omitted). Pursuant to G.L.c. 130 the Legislature has granted the Division “substantive empowering provisions . . . relating to the management of the marine fisheries . . . which shall govern . . . the manner of taking fish.” G.L.c. 130, §17A; White Dove, 380 Mass. at 475. “While an administrative or executive interpretation cannot bind the courts, weight should be given to any reasonable construction of a regulatory statute adopted by the agency charged with . . . [its] enforcement.” Amherst-Pelham Regional Sch. Dist v. Department of Educ., 376 Mass. 480, 491 (1978). See also Molly v. Commissioner of Dept. of Mental Retardation, 69 Mass.App.Ct. 267, 280 (2007) (“[c]ourts have long and consistently accorded substantial deference to a reasonable interpretation of a statute by the administrative agency charged with its administration and enforcement”).
This is not a case in which an agency’s interpretation of its own regulation “cannot be included fairly within [the rule’s] prohibitions.” Finkelstein v. Board of Registration in Optometry, 370 Mass. 476, 479 (1976). There, the Board’s interpretation of “advertising” contravened the plain language of the underlying regulation, and was rejected by the court. Here, as the Director points out, the regulation expressly permits the precise action he has taken.
*392 Finally, the Court concludes that §6.04, as construed herein, does not frustrate the intent of the enabling statute. G.L.c. 130, §1A, which establishes the Division for the purpose of administering the laws relating to marine fisheries, and “serves to protect the Commonwealth’s substantial interest in maintaining the vitality of the fishing industry in the Commonwealth.” Commonwealth v. Tart, 408 Mass. 249, 255 (1990). “When the Legislature delegates to an administrative agency a broad grant of authority to implement a program of reform or social welfare, the administrative agency generally has a wide range of discretion in establishing the parameters of its authority pursuant to the enabling legislation.” Lindsay v. Department of Soc. Servs., 439 Mass. 789, 797 (2003) quoting Levy v. Board of Reg. & Discipline in Med., 378 Mass. 519, 525 (1979) (quotations omitted). Nor have plaintiffs demonstrated that the Director’s condition on their permits, pursuant to the regulation, represents an exercise of discretion that is at variance with the intent of c. 130.
4. Federal Preemption
It is well settled that, under the Supremacy Clause of the United States Constitution, federal law may supersede state law (1) by explicit preemptive language; (2) where Congress’s intent to preempt may be inferred when the federal regulatory scheme occupies the whole field, thus precluding enforcement of state laws on the same issue; and (3) where the state law “stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” Hillsborough County v. Automated Med. Labs., 471 U.S. 707, 713 (1985).
Plaintiffs state clearly in their moving papers that their federal preemption claim is based on, and only on, the third ground enunciated in Hillsborough.[13] Plaintiffs’ Reply to Defendant’s Memorandum, at 6. Specifically, they argue that the condition imposed by the Director conflicts with the intent of Congress, set forth in the Magnuson-Stevens Act, the ATCA, and the relevant regulations, that all fishing vessels be provided with a reasonable opportunity to harvest their allocation, or quota, of bluefin tuna. Plaintiffs Memorandum, at 28, citing 16 U.S.C. §1854(g) (D). Plaintiffs contend that tuna in seinable numbers occur only in Cape Cod Bay, and that the moratorium therefore excludes them from the blue-fin tuna market and prevents them from achieving their allocation in contravention of the purpose of the federal scheme.
“The ultimate touchstone of preemption analysis is the intent of Congress.” City of Charleston v. A Fisherman's Best, 310 F.3d 155, 169 (4th Cir. 2002). Even though not expressly contradictory, state action may still be nullified where it is in “actual conflict with precise and sufficiently narrow objectives that underlie the federal enactments . . . [or] when it is impossible to comply with both state and federal law.” Id.
In the Court’s view, the purpose of the federal scheme is broader than that stated by plaintiffs; simply put, it is to preserve and protect United States fisheries. The Magnuson-Stevens Act, which defines highly migratory species as a valuable and renewable natural resource, declares that “(c)ertain stocks of fish have declined to the point where their survival is threatened, and other stocks of fish have been so substantially reduced in number that they could become similarly threatened as a consequence of (A) increased fishing pressure, (B) the inadequacy of fishery resource conservation and management practices and controls, or (C) direct or indirect habitat losses . . .” 16 U.S.C. §1801(2). In response, the Act was fashioned “(1) to take immediate action to conserve and manage the fishery resources found off the coasts ... (2) to support and encourage the implementation and enforcement of international agreements for the conservation and management of highly migratory species ... (3) to promote domestic commercial and recreational fishing under sound conservation and management principles . . . [and] (4) to provide for the preparation and implementation ... of fishery management plans which will achieve and maintain, on a continuing basis, the optimum yield from each fishery . . .” 16 U.S.C. §1801(b). Similarly, the regulations promulgated pursuant to the Act and the ATCA, 50 Code Fed. Regs. §635.1 et seq., “govern the conservation and management of Atlantic tunas ...”
Plaintiffs urge the Court to consider City of Charleston v. A Fisherman’s Best, 310 F.3d 155 (4th Cir. 2002) (local resolution affecting longline swordfish harvesting held preempted by federal law), as dispositive in the present case.
The city of Charleston, South Carolina, in response to recreational and sports fishing interests, enacted a resolution prohibiting the docking at its Maritime Center of longline vessels that fished for swordfish in federal waters.[14] 310 F.3d at 159. The court, noting that there were no other adequate docking facilities for longline vessels within 100 miles of the Maritime Center, concluded that the city’s resolution would effectively prohibit the use of longline gear in direct contravention of federal law, which designated longl-ine as the authorized gear for catching Atlantic swordfish. Id. at 170-74, 177.
The Charleston resolution was held preempted by federal law not because it addressed local sustainability and allocation issues, as here, but because it effectively stopped precisely the commercial fishing for swordfish in federal waters that the federal scheme was intended to permit. As the court in City of Charleston noted, “over ninety-eight percent of the swordfish catch made by swordfish vessels in waters off South Carolina is made with longline tackle,” id. at 160; *393 moreover, longline vessels accounted for more than 95% of the United States swordfish landings,[15] id. at 175. Bluefin tuna, by contrast, are harvested with a variety of gear other than purse seines, and the latter account for but 18.6% of the quota for bluefin tuna. The one-year prohibition of seining in Cape Cod Bay, particularly in light of the limited catch available to purse seiners under federal law, is far from the complete and permanent shutdown of federally-designated commercial fishing which the Charleston resolution represented.
Plaintiffs also rely on 50 Code Fed. Regs. §635.27(a)(8)(vii) and (viii), §635.27(a)(9), and §635.28(a)(3) to support their argument that the federal scheme intended that the purse seine category (as well as other categories) have a reasonable opportunity to harvest its portion of the allocated domestic quota. While plaintiffs acknowledge that they are not guaranteed their opportunity to harvest their allocated catch, they argue that “a state should not be able to materially impede the permit holder’s ability to do so, either.” Plaintiffs’ Memorandum, at 34. That argument effectively posits that the federal allocation is an entitlement which the state, at least, is precluded from affecting in any material way, for any length of time, for any reason.
The problem with plaintiffs’ argument is illuminated, in a related context, in Blue Water Fisherman’s Association v. Mineta, 122 F.Sup.2d 150 (2000). That case speaks both to the intent of the federal scheme at issue in this case, and to permissible limits on fishing for highly migratory species (HMS).
Plaintiffs in Blue Water challenged federal regulations governing longline fishing for bluefin tuna and other species covered by the Magnuson-Stevens Act. According to the court,
[t]he purpose of the Magnuson-Stevens Act is to protect HMS in waters extending two hundred (200) miles from the United States coast through conservation and management measures . . . Congress found that many HMS were “overfished” and that as a result of “increased fishing pressure” and “the inadequacy of fishery resource conservation and management practices,” the survival of HMS “is threatened.”
Id. at 156 (citations omitted). Plaintiffs there contended that “any regulation that detracts from their ability to catch and sell their portion of the ABT quota violates National Standard One,[16] because the fishery as a whole would not be able to achieve optimum yield each year.” Id. at 161. The court found plaintiffs’ argument unavailing:
Nothing in the regulations presumes that longliners are entitled to catch their allotted quota. As defendant points out, even if applicable statutes and regulations require the HMS FMP [fisheries management plan] to allow fishers to catch the optimum yield of ABT every year, such a requirement would not necessarily translate to a right vested in the pelagic longline industry to catch its annual allotted quota; rather, it would run to the rights of United States fishers as a whole.
Id. (emphasis in original).
The present case echoes Blue Water in the context of purse seiners. Assuming that the federal regulations are designed at least in part to afford purse seiners a reasonable opportunity to harvest bluefin tuna, there is nothing in the federal scheme that guarantees that opportunity. Although the NMFS is charged with “maintaining an economically viable fishery,” 50 Code Fed. Regs. §600.310(f)(d)(1), it is also charged with setting out a plan that prevents overfishing and rebuilds the fish stock as quickly as possible. 16 U.S.C. 1854(e)(4)(A)(I). Here, as in Blue Water, yield is a standard that “should be achieved over the long-run, not necessarily a standard that must be achieved with precision each year.” Blue Water, at 161.
Thus the Director’s condition on plaintiffs’ permits comports with the federal scheme. Where the permit condition prohibits seining in the Bay for the 2008 season only, it does not contradict the regulations, which guarantee no yearly yield, and provide for adjustments should the seiners fail to harvest their 2008 allocation.[17]
Finally, because the purpose behind the state action is relevant in determining whether preemption applies, City of Charleston, 310 F.3d at 174, the Court examines the Director’s reasons for imposing the permit condition. Those reasons, set forth in SAF, Ex. 10 and quoted above, maybe summarized as (1) the effect of seining on the sustainability of bluefin tuna stock in Cape Cod Bay, and (2) allocation and user conflict. Thus it is not the case, as plaintiffs argue (Reply to Defendant’s Memorandum, at 15[18]) that the Director’s action is preempted because its “sole purpose” was economic allocation.
CONCLUSION
Where the Director acted within his authority, and the permit condition is not preempted by federal law, the Court concludes that plaintiffs have not demonstrated a likelihood of success on the merits were the case to proceed further. Nor have plaintiffs established irreparable harm, where the permit condition applies only to the 2008 season, during which they may fish in other waters. Finally, the public interest is better served by upholding an otherwise valid condition intended, in part, to improve the sustainability of bluefin tuna in Cape Cod Bay in the longer term. Accordingly, the plaintiffs’ request for a preliminaiy injunction will be denied.
With regard to plaintiffs’ motion for summary judgment declaring the rights of the parties, the Court concludes that, in light of the undisputed facts and *394 the above conclusions of law, judgment should enter in favor of defendant.
ORDER
For the reasons stated above, the plaintiffs’ motion for a preliminary injunction is DENIED. It is further ORDERED that judgment shall enter declaring that the Statement of Conditions applicable to the 2008 permits issued by defendant Director for the plaintiffs’ respective vessels, and prohibiting purse seining for bluefin tuna in Cape Cod Bay, was issued by authoriiy granted to the Director under 322 Code Mass. Regs. §6.04(4)(c), is not preempted by federal law, and is thus valid and fully enforceable.

Sea Rover Fishing, Inc. owns and operates a 99-foot purse seine fishing vessel, the DIANE MARIE; Kathryn Ann Fishing, Inc., an 80-foot purse seine fishing vessel, the KATHRYN ANN; and North Queen Fishing, Inc., a 96-foot purse seine fishing vessel, the NORTH QUEEN. The home port of the DIANE MARIE and the KATHRYN ANN is Falrhaven, Massachusetts; the home port of the NORTH QUEEN is New Bedford, Massachusetts. Plaintiff Ingrande is an officer of all three entities, and the person designated to receive all necessary permits.

Other defined categories and their respective quotas are: general category (commercial, using rod and reel, handlines, and harpoons), 47.1%; angling (recreational, using rod and reel), 19.7%; longline (commercial, restricted fishing for blue-fin), 8.1%; harpoon, 3.9%; trap, 0.1%; and reserve, 2.5%. 50 Code Fed. Regs. §635.27.

These restrictions apply only to purse seiners, insofar as the term “fish for” is defined as “to harvest, catch, take or encircle . . . any tuna by means of a purse seine." 322 Code Mass. Regs. §6.04(2)(c).

Froml988 through 2007 the average weight per tuna seined inside the Bay was 537 pound, compared with 377 pounds outside the Bay.

“User conflict,” as defined by the parties, is generated by competition for the same fish among different fishing categories using different fishing gear.

The permits, by their terms, expire December 31, 2008.

The Court notes, in SAF, Ex. 10 (October 9, 2007 Memorandum from the Director to the Advisory Commission), the Director’s statement that, under the authority of §6.04(4), “I intend to implement a prohibition on seining for Atlantic bluefin tuna in Cape Cod Bay that will take effect in 2008 and will remain in place until further notice from the Division.” The parties have agreed that what the Director was announcing in that memorandum was “his intention to condition the purse seine regulated fishery permits for 2008.” SAF, ¶61. Their joint interpretation of the Director’s statement is consistent with the Court’s view that his imposition of the condition is limited to 2008, both because the regulation he cites in the October 9, 2007 Memorandum allows him to impose the condition only on permits, which are issued annually, and because “further notice” is indefinite, and might be given prior to the 2009 season. Indeed, the Director had earlier characterized his intended action as implementing “an additional one-year prohibition on seining for Atlantic bluefin tuna in Cape Cod Bay.” SAF, Ex. 9 (July 27, 2007 Memorandum from the Director to the Advisory Commission).

The Director expressed his concerns as follows:
Landings of numerous tuna during a single trip result in abrupt reductions in subsequent catches by all gear-types unless the area is replenished by new arrivals of fish to the grounds . . . Annual commercial landings of Atlantic bluefin tuna have been diminishing over the past several years . . . Although this [sic] is a U.S. quota for seine harvesters, the remnant fishery is now conducted almost exclusively in Cape Cod Bay, an area with natural features that increases vulnerability of tuna schools to seines. It is my view that this constitutes an unsustainable practice in Cape Cod Bay under present stock and overall fishery conditions. Quotas and fishing practices set by the federal government are not associated with or at times not cognizant of locally-managed areas. It’s up to the Commonwealth to manage for best fishery practices for its waters. This restriction on seines is consistent with other fishing regulations in the Commonwealth that routinely are implemented as solutions to allocation and user conflict.
SAF, Ex. 10.

The informal “genüemen’s agreement” entered into by seiners and general category fishers occurred after the regulations were implemented, and so does not provide evidence of any earlier compromise.

It should be noted not only that there is in this case no explicitly preemptive language, but also that both the Mag-nuson-Stevens Act and ACTA state that, with some exceptions, nothing therein shall be construed as conflicting with the authority and jurisdiction of any state. See 16 U.S.C. §1856(a)(1), (b)(1); 16 U.S.C. §971g(d)(e). See also 44 Fed.Reg. 122 (June 22, 1979) (application of federal regulations does not require displacement of state regulations which do not conflict with federal regulations and are not inconsistent with conservation and management of bluefin tuna). Indeed, the preamble to 322 Code Mass. Regs. §6.04 quotes the NMFS interpretation of NMFS regulations vis-a-vis the Massachusetts regulations: “ ‘No effort has been made in our continuing review of laws and regulations to prevent the concurrent application of regulations such as the Massachusetts limited entry scheme for tuna purse seine vessels.’ (44 Fed.Reg. at 3639).” Section 6.04(1). These federal pronouncements inform the analysis below of whether the Director’s action at issue here contravenes the “full purposes and objectives of Congress.”

Swordfish, like bluefin tuna, are highly migratory species and thus subject to the same federal scheme.

Alternative permissible gear for swordfish harvesting, including harpoon, rod and reel, and handline, had “no practical consequences to this case . . . [where] tackles other than longline account for less than five percent of the total catch of swordfish.” City of Charleston v. A Fisherman's Best, 310 F.3d 155, 174 n.3 (4th Cir. 2002).

 ^‘Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." Id. at 157.

The plaintiffs’ argument that the restriction essentially renders their federal permits null and void must also fail, where they still may seine for tuna in federal and international waters, and where the condition attaches for only one year.

“[T]he [Magnuson-Stevens Act] specifically requires NMFS to ensure that federal conservation and management measures are ‘fair arid equitable in allocating fishing privileges [for highly migratory species, such as ABT] among United States fishermen and do not have economic allocation as the sole purpose . . .’ 16 U.S.C. §1854(g)(l)(ii). In other words, NMFS must allocate fishing privileges based on a variety of numerous competing factors, including conservation, historic participation, and economic concerns. By contrast, nowhere does the Director even mention conservation, *395 or any concern other than economic re-allocation.” (Emphasis in text.) To the contrary, as noted the Director cites sustainability of bluefin stock as one reason for his action.